CITY OF WEST ALLIS and others, Appellants: CITY OF GREENFIELD, Petitioner, v. PUBLIC SERVICE COMMISSION, Respondent: CITY OF MILWAUKEE, Intervenor.

*No. 217. Argued April 1, 1969.—Decided May 9, 1969.*
(Also reported in 167 N. W. 2d 401.)

570

For the appellants there were briefs by *William T. Schmid,* city attorney for the city of West Allis; *Alvin R. Meyer,* village attorney for the village of Shorewood; *Van Buren Wake, Jr.,* acting village attorney for the village of Greendale; and *Harold H. Fuhrman,* village attorney for the village of Brown Deer, attorneys; and *Quarles, Herriott, Clemons, Teschner & Noelke* and *Laurence C. Hammond, Jr.,* and *Ross R. Kinney,* all of Milwaukee, of counsel, and oral argument by *Mr. Hammond.*

For the respondent the cause was argued by *William E. Torkelson,* chief counsel, with whom on the brief was *Robert W. Warren,* attorney general.

For the intervenor there was a brief by *John J. Fleming,* city attorney, and *Harry G. Slater,* deputy city attorney, and oral argument by *Mr. Slater.*

HEFFERNAN, J. The parties challenging this order are certain suburban municipalities which buy water at wholesale prices from the city of Milwaukee water utility. For purposes of water rates, the Commission has grouped these municipalities into a class known as "outside customers," as opposed to those consumers within the city which the Commission has placed in another class, denominated "inside customers." On this appeal, these "outside customers" have not challenged either the reasonableness of their classification or the Commission's determination that the water utility is entitled to receive annual revenues of $3,635,200 and that existing rates are inadequate to return this amount, or its finding that a 4.77 percent return on the rate base of $76,237,300 is reasonable, or its determination that a rate structure based on an eight percent uniform increase in rates for all classes of customers will return the revenue to which the utility is entitled.

Rather, they appeal on the very narrow question of whether the Commission, having found that the old rate as a whole was inadequate, properly applied an eight percent increase applicable to all customers without making a determination of how much of the additional cost (since 1963) was allocable to "outside customers" as a class and to each of them individually. As stated above there is no quarrel with the finding that the city was entitled to the additional revenue. That finding, both as to need and amount, is clearly supported by the evidence. The present litigation arises because the suburbs contest the allocation of these increases to them at exactly the same rate that the increase is applied to "inside customers."

The Commission determined that, under its existing rate structure, the utility could not achieve even the return that was anticipated under the 1963 schedule. It found that, in view of the increased fixed costs, the utility was obliged to increase its revenues by $1,124,700 and that an increase of eight percent applied across the board

to all its customers would generate the needed revenue. This rate increase would result in a rate of return to the utility of 4.77 percent. The schedules and the testimony that are made a part of this record make it clear that these findings of the Commission are adequately supported by substantial evidence.

A special finding was made by the Commission that the application of the eight percent rate to the "outside customers" was just and reasonable. The Commission supported its finding by the use of a cost analysis made in connection with the 1963 rate order. In that cost analysis it determined that 11.6 percent of the fixed plant costs were attributable to the "outside customers." It applied this ratio as a "guideline" to costs subsequent to 1963 and determined that, on that basis, $232,181 would have to be generated to cover that portion of the fixed costs attributable to the suburbs. According to the Commission's figures, a rate increase of 10.93 percent would have been necessary to generate this revenue. The Commission found, "This leaves a difference of 2.93% between the proposed increase in rates and the increase in fixed charges on plant previously allocated to outside service."

The method used by the Commission as tending to establish the reasonableness of the rate as applied to "outside customers" is the focus of the appellants' attack. They contend that the present use of the 1963 figures as guidelines rests upon the premise that construction and expenses subsequent to 1963 are allocable in precisely the way they were then. They contend that, if such figures are to be used, it is incumbent upon the city and the Commission to show the present validity of these earlier figures.

The judge of the circuit court who heard the appeal, well versed in public-utility regulation, properly denominated the appellants' approach when he stated:

"What the petitioners are actually arguing is that the City of Milwaukee, once having had a cost allocation study and having based its rates thereon, is now committed to conducting a similar cost-allocation study prior to any rate increase."

The law places no such duty upon a petitioner when it seeks to price its product to individuals or to classes of individuals or customers. A petitioner seeking a rate change, such as the water utility here, does have the duty to show that its total return on its investment is inadequate. It is its responsibility to prove its cost of services as a whole and to show the Commission what total revenue or rate will give it a reasonable return. Concededly, this it has done. No such duty lies in connection with "pricing" the product to a particular class of customers or to customers within a class. The function of absolute obeisance to the cost-of-service principle ends when the rate level of the utility as an entity is determined. Bonbright, *Principles of Public Utility Rates,* pages 295–297, discusses this aspect of rate making:

"In view of what has just been said, one might suppose that 'the theory' of public utility rate structures or rate differentials would call for the acceptance of no basic principle of reasonable or nondiscriminatory rates other than a mere extension of the very principle already accepted in the determination of entire rate levels, namely, the principle of service at cost. Just as, under the fair-return standard, rates as a whole should cover costs as a whole, so the rates for any given class of service (passenger versus freight, residential versus commercial, etc.) should cover the costs of supplying that class, and so the rates charged to any single customer within that class should cover the costs of supplying this one customer. Under this assumption, the theory of rate structures would be reduced to a mere theory of cost determination through the aid of modern techniques of cost accounting and cost analysis.

"Unfortunately, however, no such simple identification of 'reasonable' rates with rates measured by costs of

service is attainable; and this for several reasons, three of which will now be distinguished. The first of these reasons may be called 'practical,' whereas the other two are theoretical and are based on the non-additive character of the costs attributable to specific classes and units of service.

*"Excessive complexity of cost relationships.* The 'practical' reasons lie in the extreme difficulties of cost-of-service measurement together with the fact that, even if all specific costs could be measured, they would be found too complex for incorporation in rate schedules. Most public utility companies supply many different kinds of service even when they confine their activities to nothing but electricity, or gas, or telephone service, etc. In a very real sense, moreover, the supply of any one type of service to thousands of customers at different locations constitutes the supply of a different product to each customer. Equally truly, service rendered at any one time is not the same product as is otherwise comparable service rendered at another time.

"But these millions of different service deliveries by a single public utility company are produced in combination and at total costs, most of which are joint or common either to the entire business or else to some major branch of the business. Under these circumstances, the attempt to estimate what part of the total cost of operating a utility business constitutes the cost of serving each individual consumer or class of consumers would involve a hopelessly elaborate and expensive type of cost analysis. For this reason alone, the most that can be hoped for is the development of techniques of cost allocation that reflect only the major, more stable, and more predictable cost relationships."

In addition to this practical consideration which would, as Bonbright points out, make the appellants' proposal "hopeless" in application, two other reasons are cited in that text. One is that the sum of differential or marginal costs would not equal the total costs of the utility's operations. If pricing were done on this basis, the revenues equalling the sum of the costs of all of its services to individual customers would not be sufficient to recapture the costs of doing business. In addition, Bonbright points

out that costs relevant to total revenue requirements are different from those that are sought to be applied in determining specific rates:

"A company's total revenue requirements, as measured under a fair-return standard, depend on liabilities and quasi liabilities for the payment of operating expenses and capital costs already partly predetermined by earlier transactions, including earlier purchases of plant, land, and other resources. On the other hand, the costs most clearly relevant to the determination of specific rates, at least under an optimum-utilization objective of rate-making policy, are those anticipated costs that can still be escaped or minimized by a control of output." (p. 301.)

In an excellent discussion, Garfield and Lovejoy, *Public Utility Economics* (p. 140), point out that cost analysis "is not the same thing as making rates; the two processes are quite distinct." Their discussion points out the subjective factors that make a strict cost approach to rate making unrealistic both in attainment and in terms of operation. They summarize their discussion with the statement (p. 141), "Thus, there is no 'royal road' leading from costs to rates."

It is well established that the Commission in designing a rate structure to recover the revenue to which it is entitled, as shown by a cost analysis, has wide discretion in determining the factors upon which it may base its precise rate schedule. It is not required to apply a cost-of-service formula to each class of customer or to each customer within a class.

The practicalities of rate making were heavily relied upon in *Permian Basin Area Rate Cases* (1968), 390 U. S. 747, 776, 777, 88 Sup. Ct. 1344, 20 L. Ed. 2d 312:

"The Court has said that the 'legislative discretion implied in the rate making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself.' . . . It follows that rate-making agencies are not bound to the service of any single regulatory formula; they are permitted, unless their statutory

authority otherwise plainly indicates, 'to make the pragmatic adjustments which may be called for by particular circumstances.' "

Other cases following the same well accepted principles are *Ayrshire Collieries Corp. v. United States* (1949), 335 U. S. 573, 593, 69 Sup. Ct. 278, 93 L. Ed. 243 (there is no rigid formula which must be followed by rate-making agencies in setting rate schedules); *Mississippi Valley Barge Line Co. v. United States* (1934), 292 U. S. 282, 286, 287, 54 Sup. Ct. 692, 78 L. Ed. 1260 (structure of rate schedule is within the province of commission); *Fuels Research Council, Inc. v. Federal Power Comm.* (7th Cir. 1967), 374 Fed. 2d 842, 846 (operation by which rates are designed to recover revenues is not reducible to a simple mathematical exercise); *Pittsburgh v. Pennsylvania Public Utility Comm.* (1952), 171 Pa. Super. 187, 215, 90 Atl. 2d 607 (rejected argument by party challenging rate that rate charged should be based on cost of supplying service to the consumer and that cost allocation studies should be made to determine this cost).

It seems clear that no responsibility rests upon the Commission to make the exacting type of cost study that is urged by the appellants. It is sufficient that there be, as there is here, substantial evidence in the record to support the rate as a whole.

In the instant case, the appellants offer no contention that the rates as applied by the 1963 order were not fair and reasonable. It was determined mathematically that eight percent applied across the board would produce adequate revenue. The application of the same rate to all customers preserved the relative fairness among all customers that was concededly a feature of the 1963 order. We see no unreasonableness in the Commission's applying the facts then found to test the reasonableness of the rate increase determined in 1968. The Commission

found that the increased charges were reasonably attributable to costs which applied on all portions of the utility plant.

The burden of going forward with the evidence is upon the appellants if they are to persuade the Commission and this court that the rates as determined are unreasonable or discriminatory. The application of this rule was upheld by the Indiana Appellate Court when it sustained an across-the-board increase to an existing rate. That court stated in *Terre Haute v. Terre Haute Water Works Corp.* (1962), 133 Ind. App. 232, 246, 180 N. E. 2d 110, 43 P. U. R. 3d 278:

"The fact that the rate structure had been in effect without complaint was sufficient to establish a *prima facie* case of reasonableness as between the classes of customers. In this connection, we refer to a statement made by the New York Department of Public Utilities in the case of *Re Rochester Gas & Electric Corporation* (1940), 33 P. U. R. (N. S.) 393, 524, as follows:

" 'In the absence of convincing evidence to the contrary, it must be assumed that the fact that a schedule of rates has been in effect for a long period is at least presumptive evidence that the relationship of the various rates to each other is satisfactory to the company; otherwise, it would have long ago filed modified rates. If this is so, or in the absence of proof to the contrary, any increases found justified should be distributed on approximately a straight percentage basis.' "

Moreover, this court has held that an order of the Commission is prima facie valid, and to be upset it must be shown to be otherwise by clear and satisfactory evidence. *Madison Bus Co. v. Public Service Comm.* (1953), 264 Wis. 12, 14, 58 N. W. 2d 463.

Even assuming, *arguendo*, that the exact cost allocation to the suburbs was controlling in determining the rate structure and the 1963 allocation no longer reflected the proper cost distribution, the burden was upon the appellants to show the 1963 study was now erroneous and

that such error resulted in an unlawful rate structure. No attempt to produce such evidence has been made in these proceedings.

The suburbs also argue that, for the present rate to be sustained, the Commission was obliged to make a separate cost study of each municipality and to find that the increase was reasonable and just as to *each* member of the class of "outside customers." No authority is cited for this proposition urged by the appellants. We conclude that the Commission has no duty to make such findings in regard to individual customers even if the customer is a large wholesale user like the municipalities who are appealing here.[1]

The rationale that controls differential class pricing is explained in Garfield and Lovejoy, *Public Utility Economics, supra,* pages 135, 136:

"The pricing of public utility services differs from the pricing of most of the goods and services that consumers are accustomed to buying. The prices of the groceries on display in a supermarket or the prices of dry-cleaning services are ordinarily the same to all customers. This uniformity does not prevail in public utility pricing. Instead, (1) relatively homogeneous groups of customers, called *customer classes,* are established; (2) a different schedule of rates is applied to each class; and (3) each rate schedule ordinarily offers the individual customers within each class a graduated, descending scale of rates for incremental blocks . . . of service taken . . . . Accordingly, public utilities engage in 'differential pricing,' rather than uniform or 'supermarket' pricing, primarily because different schedules of rates apply to different classes of customers and services. It should be made clear that public utility rates generally are not made for individual customers but for different classes of cus-

[1] Sec. 196.03 (2), Stats., provides:

"For rate-making purposes the commission may consider two or more municipalities as a regional unit where the same public utility serves said municipalities, if in its opinion the public interest so requires."

tomers and services. All customers within a particular class are charged under the same schedule of rates for each service. Differential pricing in this context has reference solely to different schedules of rates for different classes of customers and services. . . .

"Differential pricing is an entirely lawful and economically desirable form of price discrimination, insofar as regulated public utilities are concerned."

We are satisfied that the findings made by the Commission are based upon substantial evidence, and the determination of the Commission was properly upheld by the circuit court.

*By the Court.*—Judgment affirmed.