VOIGHT, d/b/a Charles Voight Marine, Petitioner-Respondent, v. WASHINGTON ISLAND FERRY LINE, INC., Intervenor-Appellant: PUBLIC SERVICE COMMISSION, Respondent.

*No. 75–304. Argued March 28, 1977.—Decided July 1, 1977.*
(Also reported in 255 N. W. 2d 545.)

For the intervenor-appellant there were briefs by *Paul C. Gartzke, Herman J. Leasum* and *Bieberstein, Cooper, Bruemmer, Gartzke & Hanson,* and oral argument by *Paul C. Gartzke,* all of Madison.

For the petitioner-respondent there was a brief by *Robert J. Kay* and *Geisler & Kay,* and oral argument by *Robert J. Kay,* all of Madison.

DAY, J. On August 11, 1972 respondent Charles W. Voight, d/b/a Charles Voight Marine (referred to as the applicant), applied to the Public Service Commission (PSC) for certification under sec. 195.45, Stats. 1973[1]

[1] "195.45 *Common carriers of passengers or property by water; certificate required.* (1) No person shall operate as a common carrier of passengers or property by water except in accordance with the terms and conditions of a certificate of public convenience and necessity issued by the commission. The

to operate his cruise boats as a common carrier between Gills Rock on the northern tip of Door county and Washington Island. Appellant Washington Island Ferry Line, Inc. (the objector), which already was certified to and did operate car ferry passenger and freight service between Gills Rock and Washington Island, objected to the application. After hearings before an examiner and argument before the Commission, the Commission on December 27, 1974, contrary to the recommendations of its examiner, denied the application with one dissenting vote. Upon the Commission's denial of a rehearing the applicant commenced proceedings in the circuit court for Dane county, which, on July 21, 1975, reversed the order of the Commission and remanded for further proceedings. The objector appeals from the judgment of the circuit court. The Commission did not appeal.

The issue which we deem dispositive on this appeal is whether the PSC's decision adequately set forth the basis on which it denied the application for a certificate of public convenience and necessity.

The applicant's amended application for a certificate requested authorization for only limited service between Gills Rock and Washington Island. Under the amended application, service would be provided only between May 15 and October 15 of each year. Only round-trip tickets, available at Gills Rock and good only on the day of purchase, would be sold. As so restricted, applicant's proposal was to provide a service aimed chiefly at tourists.

commission shall issue such certificates upon a finding that the service proposed to be performed is in the public interest and required by public convenience and necessity.

"(2) Application for such certificate shall be made on forms furnished by the commission and shall contain such information as the commission requires.

"(3) Every application for a certificate under this section shall be accompanied by a filing fee of $40.

"(4) The commission may promulgate rules for the operation of this section."

The Commission found the applicant "fit, willing and able" to perform the requested operations. It nevertheless denied the application, finding that the objector's year-round operations were vital to the welfare of the people of Washington Island and would be seriously affected by competition during the profitable summer months.

Washington Island Ferry Line, Inc., the objector, was incorporated in 1962, though the ferry service has been operated by its present president, Arni J. Richter, and his father since 1940. It operates a scheduled service between Washington Island and the mainland twelve months a year, seven days a week, subject to interruptions due to the weather. The objector received a certificate of public convenience and necessity from the PSC on December 1, 1970. The line has three boats, the C. G. Richter, the Errarbakki and the Voyageur, each of which is designed to transport motor vehicles, freight and passengers. The Voyageur and the Errarbakki can each carry 148 passengers and the C. G. Richter can carry ninety-eight passengers, though the boats do not have seating capacity for that many passengers. Passenger traffic is a significant source of revenue to the objector. According to calculations it furnished to the Commission, percentage of total gross revenues derived from passengers averaged between forty-seven and fifty percent each year from 1969 to 1972. The bulk of this passenger traffic, approximately eighty-five to eighty-eight percent, occurred in the months of May through September.

Mr. Richter testified the ferry line's transport of freight during the winter months was declining and if the applicant is authorized to perform the requested service the ferry line will have to cease winter operations.

Testimony before the hearing examiner emphasized the vital role objector's service plays in the Washington Island economy. Seventeen witnesses, mostly Washington Island residents, so testified. These included, for ex-

ample, a mink farmer, a plumber and a contractor, each of whom testified he depended on the boats for supplies. A high school teacher and a representative of older residents also stated they needed the ferry.

The applicant operated a passenger carrying vessel, the Bounty II, since 1966. Upon enactment of C. 402, Laws of 1969, sec. 195.45, Stats., applicant unsuccessfully attempted to obtain "grandfather rights" to continue to operate between Gills Rock and Washington Island. In July, 1971 applicant put in service a second vessel, the Yankee Clipper, which operated between the mainland and the island selling only round-trip tickets. The applicant leases the Yankee Clipper from a corporation of which he is an officer, director and stockholder. One year later, the PSC ruled the applicant's service, with the exception of its evening "Sunset Cruise," was common carriage requiring a certificate under sec. 195.45. The Dane County circuit court affirmed. On August 11, 1972 the instant proceeding began when applicant applied for certification as a common carrier.

Applicant operated the Yankee Clipper from May through October in 1971 and 1972. During 1972, 5,257 passengers, mostly tourists, purchased round-trip tickets. Charles W. Voight described his "tour package" at a hearing on the application as follows. The tour starts out at Gills Rock on the Yankee Clipper, which seats ninety-nine passengers, and goes to Washington Island. During the cruise a lecture concerning local history and points of interest is given over the boat's speaker system. A narrated bus tour is given on the island. Alternatively, the applicant rents out bicycles and supplies picnic tables on the island. Passengers then may take another boat, the Karfi, not operated by the applicant, to Rock Island State Park. Passengers are then returned to Gills Rock on the Bounty II. The minimum service offered is the round-trip to and from Washington Island. Other parts of the tour are optional. Mr. Voight further

testified the Yankee Clipper does not transport passengers originating on Washington Island nor does it transport property other than luggage, camping equipment and similar items. Neither the Yankee Clipper nor the Bounty II carries motor vehicles.

A number of witnesses testified before the hearing examiner in support of the application. They included restaurant and motel owners and others connected with the tourist industry in Door County.

May 31, 1974 hearing examiner James Wolter issued his recommendations. In his "Proposed Decision" he said serious curtailment of the services offered by objector's ferry line "would be a disaster to Washington Island and the tip of Door County." However he found no such curtailment would result by granting the application. He said the objector made only one round-trip per day during the winter, a schedule which had to be maintained to keep a channel open through the ice. He noted objector would have to obtain PSC approval to discontinue service entirely. The examiner also said passenger and vehicular traffic on the ferry line had been increasing in the winter months and with the popularity of winter sports and year-round facilities on Washington Island, this travel was likely to continue. He also noted the ferry had a four-year mail contract for $10,000 a year. Finally, he stated, "I do not understand why the summer traffic should pay for the transportation needs of the 400 permanent residents on Washington Island during the winter."

The hearing examiner then recommended formal findings of fact, conclusions of law and an order. The recommended order granted a certificate authorizing scheduled service between May 15 and October 15 of each year, tickets to be sold only on a round-trip basis at Gills Rock. The recommended order also provided for review of the certification by the Commission or by any interested party within three years of the date the order is issued.

The Commission rejected the recommended order. However, the Commission did adopt the findings of fact proposed by the examiner with certain changes.

In finding number three the PSC deleted the last sentence, underlined below, adding nothing in its place.

"3. Applicant operated the Yankee Clipper between Gills Rock and Washington Island during the summer season (May through October) in 1971 and 1972. During 1972, 5,257 passengers purchased round-trip tickets on the Yankee Clipper for the cruise offered by the applicant between Washington Island and Gills Rock. Almost all of the passengers on these trips were tourists. Door County and Washington Island are heavily dependent upon the tourist industry and the tourist industry has been expanding in this area each year. The applicant's service during 1971 and 1972, and his proposed service herein are planned to meet the needs of tourists to the area and it is his intention to transport only passengers and their personal belongings. The applicant's operations will be an added tourist attraction and will tend to bring tourists and additional revenue to the area."

Finding number four described objector's ferry service. The Commission deleted the following suggested paragraphs:

"The operations of the Washington Island Ferry Line will not be seriously affected by the proposed operations of the applicant as amended herein.

"A scheduled passenger service between Washington Island on the one hand and Gills Rock on the other hand as proposed by the applicant in his amended application herein, is in the public interest and required by public convenience and necessity provided that said grant of authority be subject to reopening and reconsideration by the Commission, either on its own motion or upon petition of some interested Party, within 3 years from the date of the order herein."

In their place, these paragraphs were substituted:

"The operations of the Washington Island Ferry Line may be seriously affected by the proposed operations of the applicant as amended herein.

"A scheduled passenger service between Washington Island on the one hand and Gills Rock on the other hand as proposed by the applicant in his amended application herein is not in the public interest and required by public convenience and necessity."[2]

One Commissioner, Richard D. Cudahy, dissented. He wrote,

"I see no compelling reason for the protection of the existing carrier's monopoly position in a growing market going beyond what seems to me to be merely speculative damage to the winter service to Washington Island. The existing carrier's alleged winter losses are arguable and *might* be corrected, if they exist, by an appropriate and cost-justified seasonal rate differential." (Emphasis in original.)

The circuit court found essentially two defects in the findings of the Commission. First, the court considered the finding that the operations of the objector "may be seriously affected by the proposed operations of the applicant" was highly speculative and unsupported in the record. Second, the court decided as a matter of law that under sec. 227.12, Stats. 1973, the Commission did not adequately explain its reasons for altering the findings of the hearing examiner. Appellant-objector takes issue with both points.

While an agency must give the reasons behind its finding, *Transport Oil, Inc. v. Cummings*, 54 Wis.2d 256, 263, 195 N.W.2d 649 (1972), judicial review of legislative-type decisions is extremely limited. In *Robertson*

---

[2] Additionally, the word "hardship" was substituted for the word "disaster" in the sentence, "Serious curtailment of the services of the Washington Island Ferry Line would constitute a disaster to Washington Island and the tip of Door County."

*Transport Co. v. Public Serv. Comm.*, 39 Wis.2d 653, 159 N.W.2d 636 (1968), this court observed that the granting or denial of a certificate of authority by the PSC is done in the exercise of legislative discretion. Moreover, "what constitutes 'public interest' for various purposes and circumstances and without guidelines has uniformly been held to be a legislative function. *Gateway City Transfer Co. v. Public Service Comm., supra* [253 Wis. 397 (405), 34 N.W.2d 238 (1948)]; *In re City of Beloit*, (1968), 37 Wis.2d 637, 155 N.W.2d 633." 39 Wis.2d at 659.

Judicial review is provided in sec. 227.20, Stats. 1973 as follows:

"227.20 *Scope of review.* (1) The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, testimony thereon may be taken in the court. The court may affirm the decision of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions or decisions being:

"(a) Contrary to constitutional rights or privileges; or

"(b) In excess of the statutory authority or jurisdiction of the agency, or affected by other error of law; or

"(c) Made or promulgated upon unlawful procedure; or

"(d) Unsupported by substantial evidence in view of the entire record as submitted; or

"(e) Arbitrary or capricious . . ."

This court has had several opportunities to define the "substantial evidence" standard of review. In *Robertson Transport Co., supra,* 39 Wis.2d at 658, this court cited the "basic" case of *Gateway City Transfer Co., supra,* explaining:

"That case pointed out that in reviewing administrative decisions, 'substantial evidence' did not include the

idea of this court weighing the evidence to determine if a burden of proof was met or whether a view was supported by the preponderance of the evidence. Such tests are not applicable to administrative findings and decisions. We equated substantial evidence with that quantity and quality of evidence which a reasonable man could accept as adequate to support a conclusion. And, in this process, sec. 227.20 (1) (d), Stats., providing that the decision of an agency may be reversed if unsupported by substantial evidence in view of the entire record as submitted does not permit this court to pass on credibility or to reverse an administrative decision because it is against the great weight and clear preponderance of the evidence, if there is substantial evidence to sustain it."

More recent statements of this test are found in *Beloit Education Asso. v. WERC,* 73 Wis.2d 43, 70, 242 N.W.2d 231 (1976) and *DeGayner & Co. v. DNR,* 70 Wis.2d 936, 939, 236 N.W.2d 217 (1975).

In giving deference to agency findings, the court is not relieved from the responsibility of determining whether the agency's ultimate decision is based on and reasoned from those findings. Frequently it is the case, as here, that the facts are collected and findings first made not by the decision-making agency, but rather by a hearing examiner. Consequently the Legislature and this court has required that where the agency's decision is contrary to the recommendation of the hearing examiner responsibile for making the findings initially, the agency must itself explain on what evidence it has relied to support its result.

Sec. 227.12, Stats. 1973 provides in relevant part,

". . . Whenever the ultimate decision of the agency is contrary to the recommendations of the person conducting the hearing, the decision shall include a statement of facts and ultimate conclusions relied upon in rejecting the recommendations of the hearing officer. The parties may by written stipulation waive compliance with this section."

In *Appleton v. ILHR Department,* 67 Wis.2d 162, 171, 226 N.W.2d 497 (1975), this court applied to sec. 227.12 the principle stated in *Transamerica Ins. Co. v. ILHR Department,* 54 Wis.2d 272, 284, 195 N.W.2d 656 (1972) that,

". . . The parties . . . are entitled to know, not only that the department set aside the findings of an examiner but why it did so—not only what independent findings the department found proper, but on what basis and evidence it made such findings. Particularly is this true where credibility of witnesses is involved. Fundamental fairness requires that administrative agencies, as well as courts, set forth the reasons why a fact-finder's findings are being set aside or reversed, and spell out the basis for independent findings substituted."

In this proceeding the hearing examiner found that granting the certificate of convenience to the applicant would not seriously curtail the services of the ferry line. He further found that applicant's service would be an added tourist attraction and thus an economic benefit to upper Door County. The Commission, in denying the certificate, has not explained what evidence it relied on to reject these findings and reach an opposite conclusion.

The trial court correctly found that the factors relied on by the examiner and unexplainedly rejected by the Commission were relevant to the question whether such operations were in the public interest and required by public convenience and necessity.[3]

---

[3] The promotion of tourism in Wisconsin is fostered by legislative enactment. Sec. 23.09(2)(l) Stats. 1973 directs the Department of Natural Resources to:

". . . Collect, compile and distribute information and literature as to the facilities, advantages and attractions of the state, the historic and scenic points and places of interest within the state and the transportation and highway facilities of the state; and plan and conduct a program of information and publicity designed to attract tourists, visitors and other interested persons

The absence of reasoning to support the agency's ultimate decision is emphasized by the highly speculative conclusion of the Commission that the ferry operations of the objector *"may* be seriously affected by the proposed operation of the applicant." (Emphasis added.) The trial court construed "may" in this context to mean a "reasonable possibility," but only if supported by other findings of fact. While this may be a proper interpretation, we prefer to end the speculation and, on remand, allow the Commission to explain what it means. The trial court in its remand to the Commission urged that the Commission receive evidence of the operation of the petitioner and the objector for the years 1973 and 1974. We agree but urge the inquiry be extended to 1975 and 1976 assuming such evidence is available.

*By the Court.*—Judgment affirmed and cause remanded to the circuit court for proceedings not inconsistent with this opinion.

---

to this state; also encourage and coordinate the efforts of other public and private organizations or groups of citizens to publicize the facilities and attractions of the state for the same purposes. The department may maintain an office in the city of Chicago, Illinois. . . . The department shall provide advice and assistance to persons or groups engaged in the recreation industry, conduct surveys of the facilities and needs of the recreation industry and work closely with other state agencies providing services to the recreational industry."