WISCONSIN ASSOCIATION OF MANUFACTURERS & COMMERCE, INC., Petitioner-Appellant: CITY OF EAU CLAIRE, Co-Appellant, v. PUBLIC SERVICE COMMISSION, Respondent: CITY OF LA CROSSE, and another, Intervenor-Respondents.†

Court of Appeals

*No. 78–632. Argued October 29, 1979.—Decided December 21, 1979.*
(Also reported in 287 N.W.2d 844.)

† Petition to review granted.

For the appellant there were briefs by *Arvid A. Sather* and *Michael, Best & Friedrich,* of Madison, and oral argument by *Arvid A. Sather.*

For the co-appellant there was a brief by *Niles Berman* and *Wheeler, Van Sickle, Anderson, Norman & Harvey, S.C.,* of Madison, and oral argument by *Niles Berman.*

For the respondent there was a brief by *Bronson C. La Follette,* attorney general, *Steven M. Schur,* chief

counsel, and *Barbara J. Willard,* assistant chief counsel, of Madison, and oral argument by *Barbara E. James.*

For the intervenor-respondent City of La Crosse there was a brief by *George R. Kamperschroer, Richard L. Olson* and *Boardman, Suhr, Curry & Field,* of Madison, and oral argument by *George R. Kamperschroer.*

For the intervenor-respondent Northern States Power Company of Wisconsin there was a brief by *Allen W. Williams, Jr.* and *Foley & Lardner,* of Milwaukee, and oral argument by *Steven E. Keane.*

Before Donlin, P.J., Foley, J. and Dean, J.

DONLIN, P.J.  Northern States Power Company (NSP) provides natural gas service to Wisconsin customers in two principal service areas. NSP filed an application with the Public Service Commission (PSC) on July 16, 1976, for authority to increase rates for electric and natural gas utility service. After a series of hearings, the PSC issued its findings of fact and order. The PSC authorized a specific total rate of return to NSP for its natural gas utility service. Neither the appellant, Wisconsin Association of Manufacturers and Commerce, Inc. (WAMC), nor the co-appellant, City of Eau Claire, contest the authorized total rate of return as ordered by the PSC.

To provide the total revenue authorized to NSP, the PSC ordered a rate design. A petition to review the natural gas rate design portions of the order under ch. 227, Stats., was filed by the WAMC. The WAMC and the City of Eau Claire are aligned in opposition to the rate design, but challenge separate aspects of that rate design. The circuit court rejected the arguments of both parties and affirmed the PSC order in its memorandum decision. The WAMC and the City of Eau Claire both appeal from that judgment. In the interest of clarity, we will deal with these appeals separately.

The WAMC advances three arguments: (1) the PSC did not adequately explain its reasons for adopting the natural gas rate design set forth in its order; (2) the natural gas rate design adopted by the PSC is not supported by substantial evidence in the record; (3) the PSC order imposes rates that are unreasonable and discriminatory upon one class of customer in NSP's Northern Natural division.

The trial court correctly held that the natural gas rate structure in question departs from prior agency practice and thus requires an explanation of the reasons for the departure.[1] Prior to this PSC order, NSP natural gas rates were based primarily upon the cost of service to its various classes of customers. The new rate structure substantially departs from the prior policy. The WAMC complains that because of this lessened emphasis on cost of service, the new natural gas rate design allocates a disproportionately large share of the rate increase to NSP's interruptible classes of customers in its Northern Natural division.

The requirement that an agency adequately state reasons for its actions has long been recognized.[2] Although an agency must give reasons for its findings, judicial review of legislative-type decisions is extremely limited.[3] It is well settled that rate setting is a legislative agency function.[4] The court may not substitute its judgment for that of the agency in a matter of discretion.[5]

Rate design is not a mathematical application of an absolute cost theory. In its order, the PSC stated:

[1] Section 227.20(8), Stats.

[2] *Transport Oil, Inc. v. Cummings*, 54 Wis.2d 256, 195 N.W.2d 649 (1972).

[3] *Voight v. Washington Island Ferry Line, Inc.*, 79 Wis.2d 233, 255 N.W.2d 545 (1977).

[4] *Voight, supra; Friends of the Earth v. PSC*, 78 Wis.2d 388, 254 N.W.2d 299 (1977).

[5] Section 227.20(8), Stats.

Rate design is essentially an exercise in opinion and judgment in which the commission is bound by statutory requirement to be non-discriminatory, just and reasonable. The art and science of formulating rate structure requires a judgmental weighing of various design criteria such as those outlined in the electric rates section and operative factors in the industry.

It is well established that the PSC, in designing a rate structure that will enable a utility to recover the total revenue authorized, has wide discretion in determining the factors upon which it may base its precise rate schedule. It is not required to apply a cost-of-service formula to each class of customer or to each customer within a class.[6]

Thus, absolute deference to the cost-of-service principle ends when the rate level of the utility as an entity is determined.[7] Rate-making agencies are not bound to any single regulatory formula; they are permitted to make the pragmatic adjustments, which may be called for by particular circumstances, unless their statutory authority plainly precludes this.[8]

In its order, the PSC set forth the factors that it considered critical to the current circumstances of the natural gas industry and that explain its departure from past rate design. The PSC especially emphasized the dwindling total supply of natural gas available to all customers. It noted that these factors required different emphasis on certain rate design criteria than in times of ample or excess gas supplies. It restated its commit-

[6] *City of West Allis v. PSC*, 42 Wis.2d 569, 167 N.W.2d 401 (1969).

[7] *Id.*

[8] *West Allis, supra* note 6, at 577–78, 167 N.W.2d at 405, citing *Permian Basin Area Rate Cases*, 390 U.S. 747 (1968).

ment to conservation as the necessary theme of any reasonable natural gas program. The PSC stated that its new rate design would be a further conservation incentive.

The circuit court concluded that the PSC adequately set forth reasons for departing from past rate design criteria in setting the rates it ordered. We agree. Wisconsin courts have long been committed to the proposition that administrative agencies are to be given broad power within their respective jurisdictions.[9] Departure from past rate design criteria is a matter within the discretion of the PSC. It has adequately explained why it has done so in this case, and we may not substitute our judgment for that of the PSC.

The WAMC contends that the natural gas rate design adopted by the PSC is not supported by substantial evidence in the record. When sufficiency of the evidence is challenged, this court must apply the substantial evidence test,[10] and must give due weight to the experience, technical competence, and specialized knowledge of the agency involved, as well as the discretionary authority conferred upon it.[11] The substantial evidence test is simply whether reasonable minds could arrive at the same conclusion reached by the PSC.[12]

The substantial evidence test is not weighing the evidence to determine whether a burden of proof is met or whether a view is supported by a preponderance of the evidence. Such tests are not applicable to adminis-

---

[9] *Transport Oil, Inc., supra* note 2.

[10] Section 227.20(6), Stats; *Robertson Transp. Co., Inc. v. PSC,* 39 Wis.2d 653, 159 N.W.2d 636 (1968).

[11] Section 227.20(10), Stats.

[12] *Sanitary Transfer & Landfill, Inc. v. DNR,* 85 Wis.2d 1, 270 N.W.2d 144 (1978); *Westring v. James,* 71 Wis.2d 462, 238 N.W.2d 695 (1976); *Voight, supra* note 3.

trative decisions.[13] The court may not substitute its judgment for that of the agency.[14] As recently summarized by the court:

Sec. 227.20, Stats., review standards "[do] not allow a reviewing court to weigh the evidence or pass on the credibility of witnesses. Moreover, an agency determination reviewable under ch. 227 will not be overturned because it is against the great weight and clear preponderance of the evidence." . . . Thus, when the issues basically involve a dispute over conflicting testimony and a reasonable man could be convinced by either side, it is within the administrative agency's province to weigh it and accept that which it finds more credible. [Citations omitted.][15]

In effect, the WAMC argues that there is no evidence in the record that the PSC rate design will promote conservation. Conservation may be generally defined as the supervision of something by a governmental authority: such as the planned management of a natural resource to prevent exploitation, destruction, or neglect, or the wise utilization of a natural product to insure its future use.[16]

A review of the record shows that the rate design seeks to provide price signals to customers as a method of encouraging conservation. There was testimony regarding the formulation of the rates imposed on NSP's interruptible customers. These rates roughly approximate the cost of the alternative fuels these customers utilize when natural gas from NSP is not available. There was testimony that these rates may, in fact, be higher than the cost of the alternative fuels.

Evidence was presented regarding the effect that natural gas rates at, or exceeding, the cost of alternative

---

[13] *Voight, supra* note 3.

[14] Section 227.20 (8), Stats.

[15] *Sanitary Transfer & Landfill, Inc., supra* note 12, at 14, 270 N.W.2d at 149–50.

[16] WEBSTER'S THIRD NEW INT'L DICTIONARY 483 (1976).

fuels would have on natural gas consumption by interruptible customers. The predicted effect was that if the cost of natural gas is higher than the cost of alternative fuels, the interruptible customers will cease using natural gas or, at least, use less. The WAMC itself concedes that the rates ordered by the PSC are likely to have the effect of inducing interruptible customers to switch to alternative fuels.

Evidence was presented concerning the Federal Power Commission's priority levels for natural gas use and conservation. High priority levels are those more essential uses of natural gas. NSP's interruptible customers are in low priority levels. NSP's interruptible customers primarily purchase natural gas for low priority boiler use. There was testimony that under proposed national energy policies, at least one of the alternative fuels available to the interruptible customers is preferred over natural gas for boiler use.

The PSC urges that it is a conservation measure to wean low priority users, who have alternative fuels available to them, from high quality natural gas. This is a policy determination regarding the wise utilization of natural gas to best insure a supply of natural gas for future use. The power to regulate so that rules and practices of the utilities do not render services inadequate raises, by fair implication, the power to regulate so that service will remain as reasonably adequate in the future as is practicable.[17] The PSC cannot afford to be short-sighted in this regard. This is not something the courts should interfere with.

The WAMC cites countervailing evidence and argues that the PSC's determination is incorrect. Arguments

[17] *Wisconsin's Environ. Decade, Inc. v. PSC*, 69 Wis.2d 1, 230 N.W.2d 243 (1975).

that pipeline natural gas cannot be stored for future use, or that natural gas not put to low priority use in Wisconsin remains in the pipeline and might be distributed outside Wisconsin, do not negate the PSC's position that the rates in question will promote the conservation of high quality natural gas by discouraging its low priority use. Moreover, PSC policy determinations inherent in this position cannot be assailed by citing evidence that other policies may be preferable. In an administrative proceeding, if two conflicting views may be sustained by the evidence, it is for the agency to determine which view of the evidence it wishes to accept.[18]

We will not substitute our judgment for that of the PSC. While one may differ with the conclusion reached by the PSC, it cannot be said that a reasonable person could not have reached that conclusion. The record documents the PSC's course of reasoning. We affirm the finding of the circuit court that the PSC's adoption of the gas rate design in question is supported by substantial evidence in the record.

Finally, the WAMC contends that the rates imposed on interruptible class customers in NSP's Northern Natural division are unjustly discriminatory in that they discriminate against this class of customer without reasonable justification. The WAMC cites a Wisconsin Supreme Court case for the proposition that the action of the PSC may not be arbitrary or capricious.[19] We agree with this proposition. We note, however, that the case goes on to hold that the substantial evidence test is dispositive of the issue.[20] Where there is substantial evidence to support the PSC action, the act cannot be

[18] *Robertson Transp. Co., Inc., supra* note 10.
[19] *Westring, supra* note 12.
[20] *Westring, supra* note 12.

arbitrary or capricious. We have found substantial evidence in the record to support the PSC rate design as ordered.

Differential pricing, *i.e.*, different schedules of rates for different classes of customers and services, is an entirely lawful and economically desirable form of price discrimination, insofar as regulated public utilities are concerned.[21] Also, as we noted previously, the PSC has wide latitude to determine factors upon which to base its rate schedule and is not required to apply a cost-of-service formula to each class of customer.

Evidence was presented that commodity charges for interruptible class customers is lower than for residential class customers in the same NSP division, and that the interruptible rates complained of are comparable to other interruptible rates around the state and much lower than those in the other NSP division, which are uncontested by the WAMC.

The PSC must set reasonable and just rates. In light of the evidence presented, we cannot conclude that the rates ordered by the PSC are unjust, unsupported, unlawfully discriminatory, or unreasonable.

The City of Eau Claire challenges the PSC decision to maintain separate tariffs for NSP's two service areas. NSP provides natural gas utility service in two principal areas, the Northern Natural and Midwest divisions. The City of Eau Claire is located in the Midwest division. The Midwest division receives its natural gas from Canadian sources; the Northern Natural division from domestic sources. Canadian natural gas is significantly more expensive than federally regulated domestic natural gas. Eau Claire claims that the PSC is required, in its regulatory capacity as a substitute for competition,

---

[21] *West Allis, supra* note 6.

to spread the costs of NSP's higher priced gas throughout the entire system.

As previously discussed, Wisconsin statutes and case law provide for limited judicial review, and due weight must be accorded the experience and expertise of the PSC. The PSC stated that the critical issue is whether NSP's two gas systems are physically integrated to such a degree that gas is commingled from system to system. Testimony in the record demonstrates that there is no physical connection between the two pipelines in Wisconsin. The separate divisions have separate contracts with different pipeline companies, which are administered separately. The only relationship noted between the two cities was the occasional shipment of liquid natural gas (LNG) from Eau Claire to the La Crosse LNG storage facility. These shipments occurred in the past, no LNG is presently shipped between the two cities, and the PSC found that shipments would probably not resume.

The PSC found that NSP's gas utility was two separate operating systems and not physically integrated. Accordingly, the PSC ordered separate tariffs. We conclude that this determination is supported by substantial evidence in the record.

Eau Claire argues that spreading the cost would cause NSP to find another, cheaper supplier of natural gas. The PSC notes that changes in pipeline suppliers are not subject to its jurisdiction, but that of the Federal Energy Regulatory Commission. Whether spreading the cost would pressure NSP to seek a new supplier is wholly a matter of speculation, and not within the purview of the PSC.

Eau Claire further contends that it offends notions of equal protection to charge Midwest division customers more than Northern Natural division customers because

there is no rational basis for this. Customers in the Midwest division are in the same situation they would be in if the Midwest division were a separate utility. The PSC's finding that the two areas are physically separate is a rational basis for treating them as if they were separate utilities with separate rates, thus avoiding the obvious inequity of forcing Northern Natural division customers to pay for expensive Canadian natural gas they do not use. We affirm the circuit court finding that the rates ordered by the PSC do not constitute unlawful discrimination.[22]

*By the Court.*—Judgment affirmed.

FOLEY, J. (dissenting) The new PSC natural gas rates will result in increased firm customer costs and, arguably, will competitively disadvantage businesses within the affected tariff areas. Absent evidence of any resulting conservation, I would reverse that portion of the circuit court judgment denying relief to the WAMC and would remand this matter to the PSC for reconsideration.

The PSC contends that if a rate design reduces use of natural gas by interruptible customers, some conservation will automatically result. While this simplistic statement of the PSC position made by its counsel in oral argument has a certain logical appeal, it does not find support in the record. What the record does support is that the cost of natural gas to homeowners and other

[22] Eau Claire also compared PSC treatment of NSP with PSC treatment of another utility in a separate case. This comparison is not of record in this case. Eau Claire did not show that the two companies are so similarly situated that they require similar treatment. The court has stated that inconsistencies in determinations by comparison with other cases are not proof of arbitrariness nor do these constitute a violation of equal protection of the laws. *Robertson, supra* note 10; *Nick v. State Highway Comm'n,* 21 Wis.2d 489, 124 N.W.2d 574 (1963).

firm customers will ultimately be increased as a result of the new rate design. The new rates may also put the affected Wisconsin manufacturers in a competitively unacceptable position with manufacturers from other states with lower energy costs.

Although judicial review of an agency decision is limited, a court is not relieved of the responsibility of determining whether the agency's ultimate decision is based on and reasoned from findings of fact that are supported by substantial evidence in the record. *Voight v. Washington Island Ferry Line, Inc.*, 79 Wis.2d 333, 255 N.W.2d 545 (1977). An agency must give sound reasons for its determination in order to make meaningful judicial review possible. *Transport Oil Inc. v. Cummings*, 54 Wis.2d 256, 195 N.W.2d 649 (1972). Although we must accept agency findings of fact if they are supported by substantial evidence, *Sanitary Transfer & Landfill, Inc. v. DNR*, 85 Wis.2d 1, 270 N.W.2d 144 (1978), if the agency findings are not supported by the record, then the agency has not provided an adequate explanation for its decision.

In this case, the PSC gives two reasons for its rate design: (1) promotion of conservation, and (2) ease of transition to other fuels by low priority users. The second reason is really only a method of achieving conservation. The PSC defines conservation as any reduction in natural gas use by any gas customers. The WAMC, conversely, contends that conservation only results: (1) if there is a total reduction in gas consumption, more gas is actually left in the ground; or (2) if there is less natural gas used for low priority uses leaving more for high priority uses. The WAMC contends that the present rate design will not effect either of these results.

Accepting the PSC definition of conservation, as the majority does, requires an affirmance. If we were, however, to accept the WAMC's definition, we would have to

reverse and remand, since there is no evidence that such conservation will result. By the PSC definition, conservation results if a Wisconsin interruptible customer uses less gas, even if that gas is ultimately consumed by the same type of low priority user in another state. A claim that this is conservation should not receive judicial approval.

To understand the full impact of the PSC decision, it is necessary to understand the process by which natural gas is bought, allocated and sold in Wisconsin. There are two classes of customers involved: firm customers and interruptible customers. Firm customers are those who have a consistant and absolute need for natural gas and commonly include such users as homes, churches, schools or hospitals. Interruptible customers are those who can use either natural gas or another fuel, commonly industrial users. Traditionally, natural gas was less expensive than the alternative fuel and will continue to be slightly less expensive to the interruptible customer under the new rate design.

A utility must buy enough natural gas to meet the peak demands of its firm customers. On any given day, some of this gas will probably not be used by the firm customers. The excess gas is then sold to the interruptible customers who get it at a lower price because the interruptible customers cannot depend on the supply. The utility must pay for the peak amount of natural gas potentially needed by firm customers regardless of whether the gas is completely used by utility customers. By selling excess gas to the interruptible customers, the utility picks up income that would otherwise be lost and at the same time provides some benefit to interruptible customers in Wisconsin. If the excess gas were not sold to the interruptible customers, the utility would have to charge the firm customers more for the gas they use to pay for the gas not used but still purchased.

Furthermore, the PSC does not dispute the fact that once the gas is taken from the well and put in the pipeline, it cannot be conserved. It can be neither put back in the well nor stored in Wisconsin for future use. Once the utility contracts for a certain amount of gas, that gas is put in the pipeline and must be used somewhere along the pipeline. If the gas is not used by Wisconsin's interruptible customers, it will merely be used by someone in another state. We have no way of knowing if the gas will be used by a low or high priority user in that other state. The practice of using interruptible customers to consume excess natural gas is an efficient way of utilizing all the gas bought by Wisconsin utilities and keeps the cost to the firm customers down.

Although the PSC has the power to choose between increased costs to consumers and conservation, the choice made here resulting in increased consumer costs is difficult to accept in the absence of any real conservation. The choice is even harder to accept when one realizes that the new rate design results in dramatically increased costs to Wisconsin manufacturers in the affected tariff areas. Since Wisconsin manufacturers are competing with out-of-state industries who are not necessarily subject to these higher costs, the new rate design may create an unfavorable climate for the development of new industry in Wisconsin and may put Wisconsin industry at a competitive disadvantage.

A rate structure that eliminates interruptible customers will not enable a utility to serve any more firm customers, since interruptible customers only use excess gas and that supply is never certain. Therefore, the gas cannot be used for a higher priority use, but will merely not be used in Wisconsin by either high or low priority interruptible customers.

The PSC goal of conservation is admittedly a commendable one. I do not question the power of the PSC

to effectuate this goal, even at the expense of Wisconsin consumers. I would, however, require that its largess to out-of-state consumers be justified in some manner. The PSC should not be allowed to set up a rate design with no support besides a vague claim of conservation. Action without justification is capricious, and to allow such action is an abdication of judicial responsibility and would give the PSC virtually absolute power. Finding no support in the record for a conservation effect here, I would remand this case to the PSC to either justify the present rate design or to formulate a new one.