SANITARY TRANSFER & LANDFILL, INC., Appellant, v.
DEPARTMENT OF NATURAL RESOURCES, Respondent.

Supreme Court

*No. 76–137. Submitted on briefs September 5, 1978.—*
*Decided October 3, 1978.*
(Also reported in 270 N.W.2d 144.)

1

For the appellant the cause was submitted on the brief of *Herro, Snyder, Chapman & Snyder* of Oconomowoc.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *William D. Bussey,* assistant attorney general.

BEILFUSS, C. J. The petitioner-appellant, Sanitary Transfer and Landfill, Inc., owns a 107.5 acre tract of land about four miles south of the City of Fort Atkinson in the Town of Koshkonong, Jefferson County. It is used as a solid waste disposal site. Ronald W. Nickel is the sole owner of the appellant corporation. The facility is leased to and operated by Valley Sanitation Service, Inc.

A solid waste disposal site must be licensed by the DNR. The appellant's landfill plan was originally approved by the DNR on March 30, 1970. The depart-

ment's 1970 plan approval report described the ground surface at the site as being three to 10 feet above rock or limestone and three to nine feet above the water table. At that time the department's field investigator deemed the distance to groundwater adequate and the possibility of surface water pollution unlikely. The entire 107.5 acre site was approved for licensing with the following conditions:

"1. That the sanitary landfill operation be carried on in full compliance with Wisconsin Solid Waste Disposal Standards.

"2. That only the 'area method' of landfilling be utilized.

"3. That no solid waste disposal or landfill operation takes place in the northwest lowland shown on the submitted plans."

The facility has been relicensed annually with the same stipulations, the last annual license having been issued January 15, 1975.

The DNR made no objection to the location of the landfill prior to 1973. However, on August 1, 1973, the department notified Ronald W. Nickel, owner and president of appellant company, of its concern regarding the location of the site. This concern was based on several factors: notice of a significant increase in the waste load of the facility;[1] updated information regarding bedrock and groundwater underlying the site, revision of DNR rules and standards, and new developments in the field of solid waste management in general. On the basis of these factors and in accordance with DNR routine review procedures, appellant was asked to submit an engineering plan and a hydrogeologic study re-evaluating the facility.

---

[1] Prior to the spring of 1974 the site served a population equivalent of under 2500. After that date it served between 15,000 and 20,000 persons.

This request was subsequently made in a letter to Nickel dated September 13, 1973, which specified that the final plan should be submitted before December 1, 1973, and should contain the data listed in 7 Wis. Adm. Code, sec. NR 151.12(5).[2]

[2] 7 Wis. Adm. Code, sec. NR 151.12(5), requires plans and specifications to include the following:

". . .

"(a) Map or aerial photograph of the area showing land use and zoning with ¼-mile of the solid waste land disposal operation. The map or aerial photograph shall be of sufficient scale to show all homes, industrial buildings, wells, watercourses, dry runs, rock outcroppings, roads, and other applicable details. All such details plus the general topography shall be identified and indicated on the map or aerial photograph.

"(b) Plot plan of the site showing dimensions, location and ground surface elevation of soil borings, original and proposed final land contours, proposed trenching plan or original fill face, existing and proposed drainage patterns, winter cover stockpiles, access roads, fencing, screening, and many other applicable details. Cross sections shall be included on the plot plan or on separate sheets showing both the original and proposed minimum and maximum fill elevations, thickness and type of underlying soil strata, and ground water and bedrock elevations. The scale of the plot plan shall be 1 inch equals 200 feet.

"(c) An acceptable report on geological formations based on soil borings. The minimum number of borings to be taken is based on site size according to the following schedule:

"1. 3 borings for a site of up to 5 acres in size.

"2. 1 boring for each additional 5 acres or portion thereof up to 50 acres.

"3. 1 boring for each additional 10 acres or portion thereof over 50 acres.

Borings shall be arranged as nearly as possible to form a grid pattern over the site, to provide a subsurface investigation representing the entire site, and to facilitate analysis. When information is insufficient to adequately evaluate the site, additional or deeper borings may be required. All borings shall extend to a depth of at least 15 feet below the lowest proposed elevation of

On June 6, 1974, after a long delay never officially sanctioned by the department, the requested plans were received. The record indicates that the plans were deficient in an important respect. Robert Glebs, a DNR environmental engineer, testified at the administrative hearing that the data submitted totally lacked an operating plan which demonstrated how the functioning of the facility responded to the actual characteristics of the site. In his opinion it was inadequate for an engineering plan. Appellant-president Nickel himself agreed that while he attempted to comply with DNR data requirements, he had in fact "missed something."

The department reviewed the hydrogeologic study and engineering plans that were submitted and found that the landfill was located in close proximity to bedrock and groundwater, and was within an area where solid waste or the leachate it produced might have a detrimental effect on groundwater or surface water quality.

---

waste disposal in the areas of the borings. Boring holes shall be refilled with a bentonite-earth slurry prior to disposal of solid waste.

"(d) A report which shall include the following information:

"1. Population and area to be served by the proposed operation.

"2. Anticipated type, quantity and source of material to be disposed of at the operation.

"3. Source and characteristics of cover material and method of protecting cover material for winter operation.

"4. Type and amount of equipment to be provided at the operation for excavating, earth moving, spreading, compaction, and other needs.

"5. Persons responsible for actual operation and maintenance of the operation and intended operation procedures.

"6. Proposed final use of the completed operation.

"(e) The department may require groundwater monitoring wells and water quality sampling and analysis programs, provisions for gas monitoring and sampling, or provisions for protection against possible detrimental effects of leachate and gas production."

In addition, on-site inspection of the facility carried out by the department during June of 1974 revealed numerous violations of 7 Wis. Adm. Code, NR ch. 151:

"a. Portions of the landfill had been insufficiently covered.

"b. Odors and vector problems were noticed at the facility.

"c. Toxic and hazardous materials were found being stored at the site.

"d. Erosion problems were noted on portions of the site, and it was not properly graded to allow for proper surface drainage.

"e. Excavations for cover had exposed bedrock in several areas of the active landfill area where landfilling was to be done shortly."

The DNR concluded that the location of the landfill was in violation of 7 Wis. Adm. Code, sec. NR 151.12(4)(c) and (d), which declares as follows:

"(4) Solid waste land disposal operations are prohibited within the following areas:

"...

"(c) Within any area from which the department finds that solid waste or leachings therefrom may have a detrimental effect on surface water.

"(d) Within an area from which the department finds that leaching from solid waste may have a detrimental effect on groundwater quality."

On October 10, 1974, Special Order 2A–74–849 was issued, effective as of May 15, 1975, ordering closure of the landfill facility and abandonment of the site in accordance with 7 Wis. Adm. Code, sec. NR 151.12(10).[3]

---

[3] This section sets forth the following termination procedure:

"(10) Any person who maintains or operates a licensed sanitary landfill or licensed land disposal operation, or who permits use of property for such shall, when the fill area or a portion thereof reaches final grade, or when the department determines that termination is required, terminate and complete the operation in accordance with the following practices:

On October 17, 1974, Sanitary Transfer and Landfill, Inc., requested a public hearing on the order. The hearing was ultimately held on January 21, 1975 before Examiner David H. Schwarz.

On April 24, 1975, based upon the record of the hearing, the DNR made findings of fact and conclusions of law, and issued its order. The main thrust of the order is contained in its first two paragraphs:

"1. Ronald W. Nickel and Sanitary Transfer and Landfill, Inc., shall within 14 days of the date of this order terminate all solid waste operations on that portion of the solid waste disposal operation not crosshatched in red on figure 5 of Exhibit 9. The area terminated for solid waste disposal shall also be abandoned in accordance with NR 151.12 (10), Wisconsin Administrative Code.

"2. If the order recipient wishes to continue his. operations on the red crosshatched area depicted on figure 5 of Exhibit 9, he shall by June 1, 1975 submit to the Solid Waste Management Section of the Department of Natural Resources an engineering plan which conforms

---

"(a) At least 30 days prior to terminating use of the active disposal operation, the owner or operator of the operation shall notify the department of his intent to cease operations.

"(b) Within 15 days after terminating use of the operation, final closure shall be accomplished in the following manner:

"1. The entire area previously used for disposal purposes shall be covered with at least 2 feet of compacted earth sloped adequately to allow surface water runoff.

"2. The finished surface of· the filled area shall be covered with adequate top soil and seeded with native grasses or other suitable vegetation. If necessary, seeded slope shall be covered with straw or similar material to prevent erosion.

"3. Following the termination and completion of a land disposal operation, inspection and maintenance shall be continued by the owner or operator until the fill becomes stabilized.

"4. The department may require groundwater monitoring wells and water quality sampling and analysis programs, provisions for gas monitoring and sampling, or provisions for protection against possible detrimental effects of leachate and gas production."

in all respects to NR 151.12(5), Wisconsin Administrative Code. Said plan must contain all information necessary to justify continued licensing of that portion of the site."

The order differed from the original Special Order in two significant respects: first, it excepted a 15 acre area from the general termination directive to allow for preparation of a satisfactory engineering plan; second, it set the closure date for the rest of the landfill facility at 14 days from April 24, 1975, rather than at May 15, 1975, the date provided in the Special Order. Thus while the Special Order made provision for a seven month delay between the issuance of the order and the final closure date, the order which is the subject of this appeal directed that operations at the site be terminated in 14 days.

Of significance to the issues presented in this appeal are the following findings of fact:

"...

"4. Of the 107.5 acres originally licensed by the Department in 1970, only about 15 acres *may* be suitable for continued use as a solid waste disposal area. The remaining acreage lies in close proximity to bedrock and/or groundwater and thereby creates a high degree of probability that solid waste or leachings therefrom will have a detrimental effect on groundwater . . .

"5. Lack of information regarding the geological make-up and soil permeability of the earth beneath the 15-acre area described above, makes the suitability of that portion of the site for disposal of solid waste uncertain.

"6. Both surface drainage and groundwater flow at the facility discharge into a wetland in the northwest portion of the site which in turn discharges into Lake Koshkonong. The location of the facility is in an area where solid waste or leachings therefrom may have a detrimental effect on surface water.

"...

"8. Inadequate grading at the site has caused improper surface water drainage and tends to cause increased leachate production."

The conclusions of law provide in pertinent part:

". . .

"4. Section 144.44(1), Wisconsin Statutes, provides that after the Department has promulgated minimum standards for the location, design, construction, operation and maintenance of solid waste disposal sites and facilities, no person shall establish, maintain, conduct or operate a solid waste disposal site or facility which does not adhere to such minimum standards. Such sites or facilities shall be licensed annually by the Department, providing they comply with said standards.

". . .

"7. The location of a portion of the facility described in finding of fact 4 is in violation of NR 151.12(4)(d), Wisconsin Administrative Code.

"8. The location of the facility as it is designed and operated at the present time (as described in finding of fact 6) violates NR 151.12(4)(c), Wisconsin Administrative Code."

On May 16, 1975, appellant petitioned for judicial review of the order under the provisions of ch. 227, Stats. In the petition, Sanitary Landfill and Transfer, Inc., asserted that the agency decision was unsupported by substantial evidence, arbitrary and capricious, and constitutionally defective in its procedure.[4] Specifically, the company maintained that the evidence showed that with proper engineering the entire site could be used safely as a landfill. In addition, the company objected to the time limit of approximately one month for submittal of engineering plans on the 15 acre area which the ex-

[4] The constitutional argument, not asserted in this appeal, attacked the procedure whereby a DNR employee presides as hearing examiner in a contested case in which the DNR itself is a party.

aminer found might feasibly be engineered for use as a landfill.

The circuit court on review confined itself to the record of the agency proceedings. Certain findings and conclusions—immaterial to the ultimate validity of the April 24th order—were rejected as being unsupported by substantial evidence. The order itself was affirmed.

Judgment was entered May 3, 1976. On August 23, 1976 appellant filed a notice of appeal from the whole of the judgment. Appellant moved to stay enforcement of the agency decision pending review. The motion was denied by the circuit court on August 30, 1976.

In this appeal appellant continues to press the insubstantiality of the evidence as well as the capriciousness both of the DNR decision itself and of its timing.

One new argument, pertaining to the handling of the judicial review, has been added on appeal. Appellant contends it was improper for the trial court in the proceeding for judicial review to restrict itself to the record when addressing the issue of the arbitrariness of the time limit imposed for the preparation and submission of engineering plans for the possibly useable 15 acre tract. It is claimed that additional evidence on the impracticability of the time limit should have been allowed on the ground that appellant could not reasonably have anticipated the examiner's ruling because the original Special Order called for closure of the entire site.

Further relevant facts appear below.

■

It should be noted that the scope of review of administrative agency decisions in the Supreme Court is identical to that given to the circuit court by sec. 227.20, Stats. *Scharping v. Johnson,* 32 Wis.2d 383, 145 N.W.2d 691 (1966). At the time of the original agency proceeding this section, since amended (*cf.* Laws of 1975, ch. 414,

eff. date September 24, 1976),[5] provided in relevant part:

"227.20 **Scope of review.** (1) . . . The court may affirm the decision of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions or decisions being:
" . . .
"(d) Unsupported by substantial evidence in view of the entire record as submitted; or
" (e) Arbitrary or capricious."

Prudence and logic suggest—and sec. 227.20 (2), Stats., explicitly provides—that due weight be given the "experience, technical competence, and specialized knowledge" of the agency. Deference is especially called for in the present case where the DNR's decision for closure entailed a complex assessment of such interconnecting factors and technological data as the natural characteristics of the site (topography, bedrock, geology, hydrogeology, hydrology) ; the functioning of the facility's day-to-day operating procedures; the adequacy of the overall engineering plan; the potential long-term effect on surface and groundwater quality; the location of present and future municipal, industrial, and private wells; the existence of alternative landfill sites; and, of course, continuing developments in the general field of waste management. Furthermore, it must be remembered that the DNR has been asked to oversee and to safeguard Wisconsin's water quality not only for today's generation but also for tomorrow's. The agency cannot afford to be shortsighted.

---

[5] It should not be inferred that the changes in language made by the legislature in 1975 would have materially altered the conclusion of this opinion. No opinion is expressed on this matter; nor need it be in view of the effective date of the revision.

Sec. 227.20, Stats., review standards "[do] not allow a reviewing court to weigh the evidence or pass on the credibility of witnesses. Moreover, an agency determination reviewable under ch. 227 will not be overturned because it is against the great weight and clear preponderance of the evidence." *Superior v. ILHR Department,* 84 Wis.2d 663, 666, 267 N.W.2d 637 (1978) ; *Voight v. Washington Island Ferry Line,* 79 Wis.2d 333, 342, 255 N.W.2d 545 (1977), citing *Gateway City Transfer Co. v. Public Service Comm.,* 253 Wis. 397, 405, 34 N.W.2d 238 (1948). Thus, when the issues basically involve a dispute over conflicting testimony and a reasonable man could be convinced by either side, it is within the administrative agency's province to weigh it and accept that which it finds more credible. *Daly v. Natural Resources Board,* 60 Wis.2d 208, 208 N.W.2d 839 (1973).

With the above generalizations as a foundation, we proceed to the issues presented.

The substantial evidence test has many times been phrased and rephrased, quoted and paraphrased, defined and refined upon. Basically the test is whether reasonable minds could arrive at the same conclusion as the agency. *Daly v. Natural Resources Board,* 60 Wis.2d *supra,* at pp. 219–220, citing *Reinke v. Personnel Board,* 53 Wis.2d 123, 191 N.W.2d 833 (1971), recently reiterated the standards for applying the test to an administrative decision:

" ' ". . . The basic case is *Gateway City Transfer Co. v. Public Service Comm.* (1948), 253 Wis. 397, 34 N.W.2d 238. That case pointed out that in reviewing administrative decisions, 'substantial evidence' did not include the idea of this court weighing the evidence to determine if a burden of proof was met or whether a view was sup-

ported by the preponderance of the evidence. Such tests are not applicable to administrative findings and decisions. We equated substantial evidence with that quantity and quality of evidence which a reasonable man could accept as adequate to support a conclusion. And, in this process, sec. 227.20(1)(d), Stats., providing that the decision of an agency may be reversed if unsupported by substantial evidence in view of the entire record as submitted does not permit this court to pass on credibility or to reverse an administrative decision because it is against the great weight and clear preponderance of the evidence, if there is substantial evidence to sustain it.

" ' " . . .

" ' " '[T]he term "substantial evidence" should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside.' " ' "

There is no dispute between the parties respecting the correctness—insofar as it extends—of the data gathered on the natural characteristics of the site. Indeed, many of the DNR conclusions are based on the technological reports submitted by the appellant itself. It is the validity of the findings made and the conclusions drawn on the basis of the data that is in contention here.

The circuit court's detailed opinion evidences a painstaking and thorough sifting of the administrative record for testimony substantiating the findings and conclusions of the DNR. Those contested findings which directly underpin and materially affect the validity of the department's order are three: that the vast portion of the 107.5 acre facility is unsuitable as a landfill even with engineer-

ing modifications; that the time limits set for terminating operations and abandoning the site are adequate, that the cut-off date for submission of engineering plans on the 15 acre tract is reasonable.

All parties were in substantial agreement that the characteristics and location of the tract as a whole (minus the one 15 acre area) made it unsuitable as a natural attenuation site. The report on the site submitted by Dr. Fetter, hydrogeologist, and the review of that report by DNR geologist David Nichols reveal that the highly fractured condition of the underlying Prairie du Chien bedrock creates a great potential for groundwater contamination. In addition, poor grading at the site has tended to increase leachate production and encourage surface water pollution.

Evidence supporting the inadequacy of the location as an engineered attenuation site is also substantial.

David Nichols of the DNR's Solid Waste Management Section testified that because of the presence of the underlying Prairie du Chien limestone formation it was his opinion the potential for ground and surface water contamination from a land disposal site located in such a setting was extremely high. He further stated that because of the very poor geologic environment, even with engineering modifications, a serious potential for groundwater contamination exists.

Glebs, a DNR environmental engineer, in his testimony was asked this question and gave this answer:

"Q. Fine. Now, from a practical standpoint, not theoretical, do you feel that such a project—well, taking into account the present departmental policy with respect to the operation of sanitary landfills in marginal settings, do you feel that you could recommend that even with extensive engineering, extensive good engineering plans that a site be licensed in that locality?

"A. I basically already made the recommendation not to allow that, based upon what I've seen of the physical setting because if there was, in my opinion, at least if

there was a failure of any engineering system and we have seen them in this state, there could be significant consequences for groundwater contamination in either the immediate area of the site or widespread."

John Pacey, a registered professional engineer who testified for petitioner, was himself not without some reservations about whether the site could be successfully engineered. Specifically, he questioned the economic feasibility of the major engineering modifications entailed.

Coupled with the question of whether the 107.5 acre tract could be engineered is the question whether it should be. In this regard, testimony concerning the effect of failure of an engineering plan at this site is of importance. Glebs considered the high risk of contamination due to engineering failure a critical factor in the closure decision. Pacey acknowledged that an engineering failure at the site would have a serious deleterious effect on the quality of the groundwater in the Prairie du Chien formation.

The DNR decision that the 107.5 acre tract is unsuitable for operation as a landfill even with engineering modifications is supported by substantial evidence in the record.

The circuit court's concise treatment of the termination and abandonment issue is dispositive:

"The first attack is that [the timing schedule] was not promulgated under the procedure set forth in NR sec. 151.12(10), Wis. Adm. Code. . . .

". . .

"The petitioner is correct in its statement that sec. NR 151.12(10), Wis. Adm. Code, requires disposal site operators to provide certain information to DNR [30 days] before closing sites. What the petitioner's brief fails to mention, however, is that the information required consists simply of the operator's intent to close the site.

In this case, no such notice is needed, the examiner already having taken care of the matter.

"Petitioner also attacks . . . the order on the ground that 14 days is too short a period in which to correct a serious leachate problem. The requirement in the order that the petitioner 'terminate' its operation on certain portions of the site is nothing more than a notice to the petitioner to cease placing waste in those areas within 14 days. Pursuant to the provisions of sec. NR 151.12(10), the petitioner has a further 15 days from that date to restore the site as required by that section, giving the petitioner a total of 29 days to abandon those portions of the site found unsuitable. All required duties with respect to abandonment are found in sec. NR 151.12(10). . . ."

Apart from the notice requirement (which as indicated above is inapplicable here), the timing schedule fits well within the time for closing provided by the Administrative Code provision. Nor has the reasonableness been challenged by the appellant in this court. In addition, there is testimony in the record by Robert Glebs that if the decision was made to close the site tomorrow there would be nothing unusual that Nickel would have to do with the site to make it conform to the Administrative Code.

This part of the department's order is also supported by substantial evidence in the record.

The determination to allot only thirty-five days for the submission of engineering plans for the 15 acre tract has two facets: consideration of the risks of further ground and surface water contamination from continued operation of the facility; calculation of the time necessary to prepare the engineering plans on this small parcel in light of the considerable body of information already submitted. The danger of continued operation of the site on the 15 acre tract was brought out above in the analysis of the inadequacy of the natural characteristics of the tract as a whole. To the problem of the fractured state of the Prairie du Chien limestone is added the possibility

that St. Peter's sandstone might underlie the 15 acre area. Since St. Peter's sandstone is an aquifer through which groundwater contaminated by continued waste disposal operations would flow, this is an important factor in determining how much time might safely be allowed for plan preparation. Glebs, in light of the above facts, testified that no part of the site should be kept open pending engineering plan approval. Pacey, who testified for appellant, could offer no opinion on continued operation of the site without plan approval.

The reasonableness of the thirty-five day period in terms of the time needed for preparing the plans is not without support in the record. Glebs testified that, in view of the quantity of background information on the facility already in the hands of the DNR, the rest of the information and the preliminary design could be had "within a month or so." Pacey thought two or three months would be more realistic. The credibility of these witnesses and the weight to be given their testimony was within the province of the agency.[6] The time allotted is supported by substantial evidence.

"Arbitrary or capricious action . . . occurs when it can be said that such action is unreasonable or does not have a rational basis. . . . Arbitrary action is the result of an unconsidered, wilful and irrational choice of conduct and not the result of the 'winnowing and sifting' process." *Olson v. Rothwell,* 28 Wis.2d 233, 239, 137 N.W.2d 86 (1965).

In formulating the order at issue in this appeal, the DNR, as the record clearly reveals, viewed and reviewed the great quantities of data and numerous conflicting factors outlined in the preceding sections of this opinion.

---

[6] *Daly v. Natural Resources Board,* 60 Wis.2d 208, 208 N.W.2d 839 (1973).

The contention that its judgment was in any way "irrational," "unreasoned," or "unconsidered" is without merit.

Sec. 227.20, Stats., governs the scope of judicial review of administrative decisions. That statute provides:

"(1) The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, testimony thereon may be taken in the court. . . ."

No such irregularities were alleged in this case. The trial court therefore properly limited itself to the record made at the hearing.[7]

The plain language of the above statute and case law notwithstanding, appellant maintains that it was error for the trial court not to consider evidence outside the record on review of the DNR order. Appellant contends that additional information (specifically, data on the time required to formulate comprehensive engineering and abandonment plans for the site) should have been admitted in view of the fact that the order issued following the January, 1975 hearing differed in certain respects from the original Special Order. Appellant may have, in fact, been personally surprised at the result of the hearing. However, considering the hearing examiner's legitimate authority under sec. 144.35, Stats., to affirm, reverse or modify special orders or to take "such other corrective action as may be appropriate," the contention that such a consequence could not—in an objective sense —have been anticipated has no merit.

---

[7] *See Ashwaubenon v. State Highway Comm.*, 17 Wis.2d 120, 115 N.W.2d 498 (1962); *Board of Education v. WERC*, 52 Wis.2d 625, 641, 191 N.W.2d 242 (1971); *Wisconsin Environmental Decade v. Public Service Comm.*, 79 Wis.2d 161, 170, 255 N.W.2d 917 (1977).

Furthermore, as the respondent points out, sec. 227.19 (1), Stats., outlines a specific method for the introduction of any further evidence:

"If before the date set for trial, application is made to the circuit court for leave to present additional evidence on the issues in the case, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceedings before the agency, the court may order that the additional evidence be taken before the agency upon such terms as the court may deem proper. The agency may modify its findings and decision by reason of the additional evidence and shall file with the reviewing court the additional evidence together with any modified or new findings or decision."

Supplemental evidence may be added only in accordance with these procedures.[8] Appellant alleges that the trial court refused to direct further proceedings for the presenting of additional evidence. The record however does not disclose an application required by sec. 227.19(1). The appellant has waived the right for failing to make appropriate application under the statute.

The findings and conclusions of the hearing examiner are supported by substantial evidence. The time allotted both for closure of the site and for submission of engineering plans is not unreasonable. The trial court properly confined itself to the evidence in the record on review.

*By the Court.*—Judgment affirmed.

[8] *Cf. Ashwaubenon v. State Highway Commission, supra,* fn. 7.