WISCONSIN'S ENVIRONMENTAL DECADE, INC., Petitioner-Respondent,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent-Appellant,

WISCONSIN ELECTRIC POWER COMPANY, Intervenor-Respondent-Appellant.†

Court of Appeals

*No. 80–2282.  Submitted on briefs August 31, 1981.—Decided November 24, 1981.*
(Also reported in 313 N.W.2d 863.)

† Petition to review denied.

For the appellant Public Service Commission of Wisconsin the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, *Steven M. Schur,* chief counsel, and *Barbara E. James,* assistant chief counsel.

For the appellant Wisconsin Electric Power Company the cause was submitted on the briefs of *Larry J. Martin, Andrew M. Barnes* and *Quarles & Brady* of Milwaukee.

For the respondent the cause was submitted on the brief of *Kathleen M. Falk,* general counsel.

Before Foley, P.J., Dean and Cane, JJ.

FOLEY, P.J. The Public Service Commission of Wisconsin (PSC) and the Wisconsin Electric Power Company (WEPCO) appeal from a judgment reversing portions of a PSC rate order. The circuit court concluded that the inclusion of nuclear fuel costs in WEPCO's fuel adjustment clause[1] violated the public hearing requirements of sec. 196.20(2), Stats.[2] The court also concluded that the PSC had failed to comply with the requirements of the Wisconsin Environmental Protection Act (WEPA), sec. 1.11, Stats., by its failure to adequately assess the potential environmental consequences of the depreciation rates[3] it allowed for

---

[1] Fuel adjustment clauses have been used by Wisconsin utilities for approximately 60 years. *Wisconsin's Environmental Decade, Inc. v. PSC (WED IV),* 81 Wis. 2d 344, 347, 260 N.W.2d 712, 714 (1978). Fuel adjustment clauses operate to pass on to consumers the increases or decreases in the cost of fuels used by utilities for the generation of electricity. Although adjustment clauses operate automatically to raise or lower a retail customer's electric bills according to the application of a mathematical formula contained in the clause, before determining whether increased fuel costs may be passed through, the PSC may, on its own motion, conduct a summary investigation and may order formal hearings into the matter. *See* §§ 196.28 and 196.29, Stats. Interested parties may also request the PSC to conduct further investigation into proposed rate changes. Section 196.26, Stats.

[2] Section 196.20(2) provides: "No change in schedules which constitutes an increase in rates to consumers shall be made except by order of the commission after an investigation and hearing."

[3] Depreciation, as applied to a utility's physical plant, means the loss in service value incurred in connection with the consumption or prospective retirement of utility plant. The total cost of depreciation represents the original cost of the property when it is first placed in service, less its salvage value when it is no longer used or useful, plus the cost of removing property that is no longer used or useful. Salvage values and the cost of removing

WEPCO's eventual retirement of its Point Beach nuclear generating station. Because we conclude that the trial court erroneously interpreted sec. 196.20(2) and WEPA, we reverse the judgment and affirm the order of the PSC.

The construction of a statute is a question of law, and a reviewing court is not bound by an administrative agency's interpretation of a statute. *Milwaukee County v. DILHR,* 80 Wis. 2d 445, 455, 259 N.W.2d 118, 123 (1977). The agency's construction of a statute is, however, entitled to great weight. *Id.* In fields in which an agency has particular competence or expertise, a reviewing court should not substitute its judgment for the agency's application of a particular statute to the found facts if a rational basis exists in law for the agency's interpretation and if it does not conflict with the statute's legislative history, prior court decisions, or constitutional prohibitions. *Pabst v. Department of Taxation,* 19 Wis. 2d 313, 323–24, 120 N.W.2d 77, 82 (1963).

## I. SCOPE OF THE ADJUSTMENT CLAUSE

Wisconsin's Environmental Decade, Inc. (WED) contends that the inclusion of nuclear fuel in an adjustment clause conflicts with the Wisconsin Supreme Court's construction of sec. 196.20(2) in *Wisconsin's Environmental Decade, Inc. v. PSC,* 81 Wis. 2d 344, 260 N.W.2d 712 (1978). In *WED IV,*[4] an "expanded" adjustment clause,

---

property no longer used or useful are not known until the property is actually retired from service, but they can be estimated.

[4] Throughout this opinion, the previous decisions in which Wisconsin's Environmental Decade and the Public Service Commission were litigants will be referred to as follows:

*WED I: Wisconsin's Environmental Decade, Inc. v. PSC,* 69 Wis. 2d 1, 230 N.W.2d 243 (1975).

*WED II: Wisconsin's Environmental Decade, Inc. v. PSC,* 79 Wis. 2d 161, 255 N.W.2d 917 (1977).

designed to pass along to ratepayers the increases in the cost of labor, supplies, supervision, and other non-fuel items, was found to be invalid under sec. 196.20(2). The court noted, however, that the use of "limited" adjustment clauses, which passed only increased fuel costs, was not an issue in the case. *WED IV,* 81 Wis. 2d at 348, 260 N.W.2d at 714.[5]

We conclude that *WED IV* does not require the exclusion of nuclear fuel costs from adjustment clauses. The inclusion of nuclear fuel in an adjustment clause does not expand the clause. Although nuclear fuel was not traditionally included in adjustment clauses, this was no doubt due to the fact that nuclear fuel is not a traditional fuel. Its non-traditional nature does not alter the fact that it is still a fuel rather than a non-fuel, which was the distinguishing characteristic of the objectionable items included in the expanded adjustment clause rejected in *WED IV.*[6] Because it is a fuel, it is, like other fuels, not subject to WEPCO's cost control. This provides a rational basis for treating it like other fuels by including it in an adjustment clause. Because this treatment does not conflict with the *WED IV* decision, this court will not substitute its judgment for that of the PSC. The PSC's order including nuclear fuel in WEPCO's fuel adjustment clause must therefore be affirmed.

*WED III: Wisconsin's Environmental Decade, Inc. v. PSC,* 79 Wis. 2d 409, 256 N.W.2d 149 (1977).

*WED IV: Wisconsin's Environmental Decade, Inc. v. PSC,* 81 Wis. 2d 344, 260 N.W.2d 712 (1978).

*WED V: Wisconsin's Environmental Decade, Inc. v. PSC,* 98 Wis. 2d 682, 298 N.W.2d 205 (Ct. App. 1980).

[5] The validity of "limited" or fuel adjustment clauses is also not at issue in the case before us.

[6] Contrary to the characterization advanced by WED, *WED IV* made no distinction between fossil fuels and non-fossil fuels.

## II.  NEED FOR AN ENVIRONMENTAL IMPACT STATEMENT

Prior to the present rate proceeding, the PSC, pursuant to sec. 196.09, Stats., entered an order establishing depreciation rates for WEPCO's Point Beach nuclear plant. The purpose of the depreciation rates was to provide WEPCO with funds for the eventual decommissioning of the Point Beach facility at the end of its useful service life.[7]  During the present rate proceeding, a hearing was held at WED's request to determine whether the depreciation rates should be changed.  The PSC decided not to change the rates, in part because of pending federal rules governing the accumulation of decommissioning funds.  The PSC's final order also discussed the environmental consequences of new electric service rates.  In its order, the PSC accepted the recommendations contained in a preliminary environmental impact assessment memorandum prepared by PSC staff.  This impact assessment concluded that new service rates would produce no significant environmental effects and, therefore, that the preparation of a detailed EIS was not required.  In its final order, the PSC recognized "the need for continuing evaluation of decommissioning policy, particularly in light of federal policy reformation which is presently underway and in which the commission intends to participate."[8]

---

[7] The Point Beach nuclear facility is expected to be decommissioned around the year 2000.

[8] This portion of the PSC's order appears to have been drawn from a memo prepared by PSC staff members following the hearing on the issue of the adequacy of depreciation accounting methods. The memo stated in part:

In light of the current federal regulatory action pertaining to the decommissioning issue, we believe that the preparation of an environmental impact statement by the PSC would be premature because: 1) Formulation of NRC policy and the preparation of an environmental impact statement is scheduled for 1980, and 2) The

On circuit court review, WED argued that the PSC failed to adequately assess whether the depreciation rates would provide WEPCO with sufficient funds for the decommissioning of the Point Beach facility in an environmentally safe manner. The circuit court concluded that the establishment of depreciation rates constituted agency action under sec. 1.11(2)(c),[9] and that contrary to sec. 1.11(2)(c), the PSC's preliminary environmental impact assessment did not adequately assess the consequences of the rates. *See WED III.*

We conclude that the PSC's establishment of depreciation rates is not an agency action of the kind for which WEPA requires the preparation of an EIS. WE PA requires agencies to assess the environmental consequences of their proposed actions. *WED II. WEPA* does not specify at what point in the process leading to proposed action an agency must prepare an EIS.

present PSC policy is sufficiently flexible to respond to new information (particularly regarding cost which is a strong function of the mode of decommissioning that is established by federal policy) as it becomes available. However, we do recognize the need for the Commission to continue its study of decommissioning and document its position regarding accounting procedures. We are also concerned that the $60 million currently being provided for decommissioning is inadequate, as compared to the attached estimates taken from *Conference Proceedings for State Workshops for Review of the Nuclear Regulatory Commission's Decommissioning Policy,* NUREG/CP-0003. We suggest that as a minimum the Commission's continuing study should include: a) continuing analysis of decommissioning cost for nuclear plants; and b) participation in development of federal policy.

[9] Section 1.11(2)(c), Stats., requires that all state agencies include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment a detailed statement that discusses:

1. The environmental impact of the proposed action;

2. Any adverse environmental effects which cannot be avoided should the proposal be implemented;

Because WEPA was patterned after the National Environmental Policy Act (NEPA), federal cases interpreting NEPA are persuasive authority for the interpretation of WEPA. *WED I,* 69 Wis. 2d at 11, 230 N.W.2d at 248.

In *Kleppe v. Sierra Club,* 427 U.S. 390 (1976), the Sierra Club argued that § 102(2)(c) of NEPA[10] required the Interior Department to prepare an EIS discussing the effects of the development of coal reserves in a large region of the northern Great Plains. No "proposal" for action of a regional scope existed, but federal agencies contemplated a regional plan. The Court held that where there was no evidence in the record of an action or proposal for action, no EIS was required because "there . . . [was] nothing that could be the subject of the analysis envisioned by the statute for an impact statement." *Kleppe,* 427 U.S. at 401. The Court added that "the contemplation of a project and the accompanying study thereof do not necessarily result in a proposal for major federal action . . . ." *Kleppe,* 427 U.S. at 406. *Accord: Westinghouse Electric*

---

3. Alternatives to the proposed action;

4. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

6. Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages and disadvantages of the proposal.

[10] Section 102(2)(c) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C), *et seq.,* requires all agencies of the federal government to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement . . . ." The factors to be considered in the statement are identical to the first five factors listed in § 1.11(2)(c).

*Corp. v. United States Nuclear Regulatory Commission,* 598 F.2d 759, 777–78 (3rd Cir. 1979).

The PSC, in this case, has proposed no decommissioning action. None of the methods by which decommissioning might proceed were approved, in part because federal regulations pertaining to decommissioning methods were not then in existence.[11] The depreciation rates were merely set in contemplation of eventual decommissioning. Additionally, there is no evidence in the record to show that WEPCO will be financially unable to safely decommission its Point Beach facility when decommissioning becomes necessary.

*Kleppe,* 427 U.S. at 414, also recognized that "practical considerations of feasibility might well necessitate restricting the scope of comprehensive [environmental impact] statements." Here, practical considerations limited the PSC's ability to prepare an EIS. Frederick Huebner, the administrator of the PSC's Accounts and Finance Division, was the only person to testify at the hearing at which the depreciation rates were considered. Huebner refused to testify as an expert on matters of nuclear physics, nuclear reactor engineering, or the biological and environmental effects of nuclear radiation. He was unable to form an opinion as to the technical and safety considerations involved in decommissioning. He noted that new information regarding decommissioning methods and nuclear waste disposal, as well as pending federal regulations governing decommissioning, would influence the costs of decommis-

---

[11] Federal regulations govern the construction and operation of nuclear power plants as well as the handling and disposal of radioactive materials produced by such plants. 42 U.S.C. § 2011, *et seq.* Federal regulation of nuclear power plants has been held to preempt state regulations dealing with the same subject matter. *See Northern States Power Co. v. Minnesota,* 447 F.2d 1143 (8th Cir. 1971); *Pacific Gas and Electric Co. v. State Energy Resources Conservation and Dev. Comm'n,* 489 F. Supp. 699 (E.D. Cal. 1980).

sioning. As a result, exact predictions of the cost of decommissioning were difficult to make. Finally, he stated that as new decommissioning information became available, the PSC could adjust depreciation rates and accounting methods accordingly.

We cannot conclude that the PSC's failure to set forth detailed facts bearing on the environmental impact that present depreciation rates would have on decommissioning was contrary to the requirements of WEPA. It is clear from Huebner's testimony that the PSC could not accurately predict decommissioning methods or costs. In *WED V*, 98 Wis. 2d at 690, 298 N.W.2d at 208, we stated: "The duty of an agency to prepare an EIS does not require it to engage in remote and speculative analysis. . . . Instead, the statute must be construed in the light of reason." [Citation omitted.] In the absence of information as to how decommissioning would proceed and how much it would cost, there were no factual predicates for the production of a meaningful preliminary impact assessment.[12]

Finally, in determining the extent to which WEPA requires the PSC to assess the environmental consequences of depreciation rates, deference to the PSC's

---

[12] Even assuming, for the sake of argument, that the certification of depreciation rates is a "major action," it is equally reasonable to conclude that the PSC's certification of depreciation rates is not an action "affecting the environment." In *Concord Township, Delaware County, Commonwealth of Pennsylvania v. United States*, 625 F.2d 1068 (3rd Cir. 1980), the Interstate Commerce Commission granted a Certificate of Public Convenience and Necessity to a railroad. The court, assuming that the ICC's action was a major federal action under NEPA, held that because the Certificate neither directed nor authorized railway construction, "the issuance of the Certificate can have no physical environmental impact" and upheld the agency's decision not to prepare an EIS. *Concord Township*, 625 F.2d at 1074.

expertise is particularly appropriate.[13] The court in *WED III,* 79 Wis. 2d at 423, 256 N.W.2d at 157, recognized that: "there may be cases under WEPA when some degree of deference to agency expertise is appropriate—provided the agency is shown to possess such expertise and to have applied it in good faith." In *Kleppe,* 427 U.S. at 406, the Court noted that it is not the role of the judiciary to "determine a point during the germination process of a potential proposal at which an impact statement *should be prepared.* Such an assertion of judicial authority would leave the agencies uncertain as to their procedural duties under NEPA, would invite judicial involvement in the day-to-day decisionmaking process of the agencies, and would invite litigation". [Emphasis in original.][14]

There is no evidence to indicate that the PSC has not applied its expertise in good faith. The PSC recognized

[13] The area of depreciation accounting is one recognized to be an area particularly within the expertise of the PSC. In *Wisconsin Telephone Co. v. PSC,* 232 Wis. 371, 378–79, 287 N.W. 167, 171 (1939), the court noted:

The question of what constitutes a proper depreciation charge when applied to the property of a public utility is one of the most controversial and elusive with which courts are called upon to deal. Engineers and accountants disagree violently not only upon principles to be applied but upon the method of their application.

[14] In a footnote following this statement, the Court added:

This is not to say that § 102(2)(C) imposes no duties upon an agency prior to its making a report or recommendation on at [*sic*] proposal for action. . . . the section contemplates a consideration of environmental factors by agencies during the evolution of a report or recommendation on a proposal. But the time at which a court enters the process is when the report or recommendation on the proposal is made, and someone protests either the absence or the adequacy of the final impact statement. This is the point at which an agency's action has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption. *Kleppe,* 427 U.S. at 406, note 15.

that it would be necessary to reexamine WEPCO's depreciation rates as more information on decommissioning became available. After considering WED's contentions, PSC staff did not conclude that an EIS on decommissioning policy was unnecessary, but instead only determined that an EIS would be premature. At the same time, they recognized that decommissioning could require a fund in excess of the amount it had previously estimated to be necessary and that to ensure a sufficient fund, changes in depreciation cost accounting methods might be necessary. Interpretation and application of WEPA, in the light of reason, does not support the conclusion that the PSC has failed to meet WEPA's procedural obligations.

*By the Court.*—Judgment reversed.