# WISCONSIN POWER & LIGHT COMPANY, Petitioner-Appellant,

## v.

# PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent.

Court of Appeals

*No. 88–1320. Argued December 16, 1988.—Decided January 26, 1989.*

(Also reported in 437 N.W.2d 888.)

For the petitioner-appellant there were briefs by *Eugene O. Gehl* and *Barbara J. Swan,* of Madison, and oral argument by *Barbara J. Swan,* of Madison.

For the respondent there was a brief by *Steven M. Schur* and *Barbara E. James* and oral argument by *Barbara E. James,* assistant chief counsel.

Before Gartzke, P.J., Dykman and Eich, JJ.

EICH, J.  Wisconsin Power and Light Company (WPL) appeals from that portion of an order affirming the Public Service Commission's (PSC) denial of the company's application to install a "phase-shifting transformer" as part of its electrical generation and distribution system. The issues are: (1) whether the term "public" in sec. 196.49(3)(b), Stats., which requires the PSC to certify the "public convenience and necessity" of proposed utility projects, may be read to include persons other than the customers of the particular utility applying for the permit; (2) if so, whether the commission's findings of fact are adequate to support its order; and (3) whether the PSC acted arbitrarily and capriciously by denying WPL's petition for rehearing based on the company's attempt to comply with the commission's request that it negotiate with other utilities to seek compensation for the transmission losses the phase shifter was intended to prevent.

We believe that the "public" envisioned by the statute comprises all Wisconsin consumers of utility services, not just the ratepayers of the applying utility. We also conclude that the commission's findings are adequate to support its order and we see nothing arbitrary or capricious in the procedures followed in this case.

WPL is a public utility providing wholesale and retail electric service to customers in southern and central Wisconsin. In 1986, WPL applied to the commission for a permit—a certificate of public convenience and necessity—to establish a new interconnection with an adjoining utility, Dairyland Power Cooperative. WPL and Dairyland are members of regional "pools" of interconnected electric utilities, the Mid-Continent Area Power Pool (MAPP) and the Mid-America Interconnected Network (MAIN). The primary utilities in the two pools are the Commonwealth Edison Company in Illinois and the Northern States Power Company in Minnesota. From time to time power is shifted between the pools in order to meet the needs of customers in the various regions served by pool members—from Northern States to Commonwealth Edison, for example. In such cases, the power often travels from Northern States to Commonwealth over lines owned by Dairyland and WPL.

Whenever electricity travels through transmission lines it meets resistance in the wires, and this results in the loss of some of the power as heat—much as heat is lost in water pipes as the water travels from the basement water heater to the upstairs faucet. These "transmission losses" are unavoidable, and, all else being equal, the more power a line carries, the more losses will result. And these losses increase the utility's overall cost of production and transmission because, to

meet its customers' needs, the utility must compensate for the losses by generating more electricity than would otherwise be necessary.

In cases where WPL is part of the power transfer transaction—as when it purchases power from Northern States and then resells it to Commonwealth Edison—it can recover compensation for the transmission losses in the price it charges Commonwealth. But electricity also travels through WPL lines in interregional power transfers through the MAIN and MAPP grids in cases where WPL is not a party to the transaction. This is so because electricity will always seek the path of least resistance. Thus, when a utility to the west of WPL's service area sells electricity to one south of it, and the path of least resistance is through WPL lines, the electricity will travel through those lines. When this happens, WPL's system power losses—and therefore its operating costs—increase.

A phase shifter is a device which can, in effect, alter the resistance on a company's lines so that only so much power will flow through those lines as the shifter permits. With the device in place, WPL would be able to "stop" power which would otherwise enter and flow through its lines on the way from the western seller to the ultimate southern purchaser. The power, meeting the increased resistance created by the phase shifter, will seek out a freer path through the lines of another utility. By "rerouting" or diverting these interregional transfers onto the lines of other utilities, WPL will be able to eliminate losses it otherwise would incur by "shifting" those losses to neighboring utilities.

The commission, finding that "[t]he primary proposed purpose for the phase shifter was to minimize total electrical losses for the combined WPL and [Dairyland] transmission systems by shifting these

losses to other transmission systems," determined that the project would neither improve WPL's system efficiency or reliability, nor reduce or eliminate overall system losses. Then, finding that installation of the shifter "would add to the cost of electric service for all ratepayers without proportionately increasing the value of service" and was not necessary to meet the public's needs for an adequate supply of electricity, the commission denied WPL's application. WPL sought review in the circuit court and the court affirmed the commission's order.

## I. "PUBLIC" CONVENIENCE AND NECESSITY

WPL's application was filed under sec. 196.49(3)(b), Stats., which provides as follows:

> [N]o project may proceed until the commission has certified that public convenience and necessity require the project. The commission may refuse to certify a project if it appears that the completion of the project will do any of the following:
>
> 1. Substantially impair the efficiency of the service of the public utility.
>
> 2. Provide facilities unreasonably in excess of the probable future requirements.
>
> 3. When placed in operation, add to the cost of service without proportionately increasing the value or available quantity of service unless the public utility waives consideration by the commission, in the fixation of rates, of such consequent increase of cost of service.

As indicated, the PSC found as an "ultimate fact" that construction of the phase shifter was not necessary to satisfy the reasonable needs of the public for an adequate supply of electric energy. It also found that the shifter would add to the cost of service for "all

ratepayers" without proportionately increasing the value of the service. These determinations were based on other commission findings that the primary purpose of WPL's proposed installation of the phase shifter was to minimize the losses incurred by its participation in interregional transfers by "shifting" those losses to other utilities' transmission systems. WPL has not challenged any of the commission's findings of fact.

WPL argues first that because it is undisputed in the record that its ratepayers will benefit from the phase shifter due to that device's ability to reduce the losses and resulting costs incurred by the utility when interregional transfers of electricity flow through its lines, the commission must have interpreted the word "public" in the statutory phrase "public convenience and necessity" as extending beyond those members of the public who are WPL customers—to the entire "consuming public" of the state. This, WPL contends, is an erroneous interpretation of the statute.

Generally, questions relating to the interpretation and application of statutes are questions of law which we review *ab initio*. *American Motors Corp. v. ILHR Dept.*, 101 Wis. 2d 337, 353–54, 305 N.W.2d 62, 70 (1981). Where, however, the agency whose interpretation we are reviewing is operating in a field in which it has "a particular competence or expertise," we give its interpretation some deference:

> [A] reviewing court should not substitute its judgment for the agency's application of a particular statute to the found facts if a rational basis exists in law for the agency's interpretation and if it does not conflict with the statute's legislative history, prior court decisions, or constitutional prohibitions.

*Wis. Environmental Decade v. Public Serv. Comm.*, 105 Wis. 2d 457, 460, 313 N.W.2d 863, 865 (Ct. App. 1981). In addition, where a legal question is intertwined with factual, value or public policy determinations, courts will defer to the agency whose responsibility it is to make those determinations. *West Bend Education Ass'n v. WERC*, 121 Wis. 2d 1, 12, 357 N.W.2d 534, 539–40 (1984).

We have no doubt that the commission has expertise and special competence in administering sec. 196.49, Stats., insofar as that statute requires it to determine what proposed projects are appropriate additions to an electric utility's generating and transmission facilities. We believe also that the question of law—the interpretation of the statute empowering the commission to regulate additions to utilities' generation and transmission facilities—is so intertwined with the facts, values and policy considerations involved in such decisions that the commission's conclusions are entitled to "great weight." *West Bend Education Ass'n*, 121 Wis. 2d at 13, 357 N.W.2d at 540. As a result, we should affirm those conclusions "if a rational basis exists for them or, to state the rule in another way, if the agency's view of the law is reasonable even though an alternative view is also reasonable." *Id.* at 13–14, 357 N.W.2d at 540 (footnote omitted). Finally, Public Service Commission orders are "prima facie valid, and to be upset [they] must be shown to be otherwise by clear and satisfactory evidence." *West Allis v. Public Service Comm.*, 42 Wis. 2d 569, 579, 167 N.W.2d 401, 406 (1969). In this case, WPL has not persuaded us that the commission's interpretation of sec. 196.49(3)(b) lacks a rational basis, conflicts with the legislative history of the statute, or is otherwise illegal.

In support of its argument that the "public" whose "convenience and necessity" is to be assessed in all sec. 196.49(3)(b), Stats., applications should be limited to the applying utility's customers, WPL first refers us to two earlier cases in which the commission is said to have reached that conclusion. With respect to one, *Application of the Village of Waterloo,* 25 PSC Reports 111 (1941), the company simply notes that the commission's findings of fact "were specifically stated in terms of impact on the Village of Waterloo as an electric public utility and its ratepayers." In the other, *Application of The City of Richland Center,* 53 PSC Reports 240 (1968), it appears that the commission, in granting one utility permission to interconnect with another, considered only the effect of the proposed project on the applying utility and its ratepayers. Given these decisions, WPL asserts that the commission has interpreted sec. 196.49(3)(b) as limiting its consideration of the "public" interest to the interests of the applying utility's customers and suggests that the commission should be bound by its former interpretations. We disagree for two reasons.

■

First, as the commission notes, this is a case of first impression—it is the first time the commission has been asked to approve a project whose primary purpose it has found to be the shifting of system losses to the ratepayers of adjoining utilities. Second, quasi-judicial agencies such as the Public Service Commission are not subject to the rule of *stare decisis, Union State Bank v. Galecki,* 142 Wis. 2d 118, 124, 417 N.W.2d 60, 63 (Ct. App. 1987), and we agree with the commission that it should not be bound by prior decisions made in other situations and in other contexts.

WPL also challenges the commission's broad interpretation of "public" convenience and necessity as erroneous. In *Clintonville Transfer Line v. Public Service Comm.*, 248 Wis. 59, 72, 21 N.W.2d 5, 12 (1945), the supreme court stated:

It is true that the words "public convenience and necessity" are not words of precise legal content.
. . . .

"The term is relative rather than absolute. No definition can be given that would fit all statutes in which the word has been used. The meaning in a given case must be ascertained by reference to the context and to the objects and purposes of the statute in which it is found." [Citation omitted.]

WPL, citing a dictionary definition of "public" as a group of people with common interests, or, more specifically, "the group at which a particular activity or enterprise aims," contends that because a public utility is an entity holding itself out to provide utility service to those wishing to utilize it within its service territory, the word, as it appears in the statute, must be confined to that group—the utility's "ratepayers within its service territory." But Webster also defines "public" as "relating to, or affecting all the people or the whole area of a nation or state ... UNIVERSAL ... GENERAL." Webster's New Collegiate Dictionary 932 (1977). And we believe this to be the more appropriate definition of the word in the context of the commission's regulatory powers under sec. 196.02, Stats.

Companies providing electric service, like other utilities, are regulated because they are "affected with a *public* interest." *Madison v. Madison Gas & Electric Co.*, 129 Wis. 249, 264, 108 N.W. 65, 68 (1906) (empha-

890

sis added), quoting *Munn v. Illinois,* 94 U.S. 113, 126 (1877), a case generally regarded as the foundation of the American system of public utility regulation. *See* M. Glaeser, Outlines of Public Utility Economics 162 (1927).

> Property does become clothed with a public interest when used in a manner to make it *of public consequence, and affect the community at large.* When, therefore, one devotes his [or her] property to a use in which the public has an interest, he [or she], in effect, grants to the public an interest in that use, and must submit to be *controlled by the public for the common good ....* *Madison,* 129 Wis. at 264, 108 N.W. at 68 (emphasis added), quoting *Munn,* 94 U.S. at 126.

The legislature has given the commission the power and "jurisdiction to supervise and regulate every public utility in this state and to do all things necessary and convenient to its jurisdiction." Sec. 196.02(1), Stats. The supreme court has characterized these powers as "broad, comprehensive, and all-inclusive." *Hotel Pfister v. Wisconsin Telephone Co.,* 203 Wis. 20, 23, 233 N.W. 617, 618 (1930), quoting *Commonwealth Telephone Co. v. Carley,* 192 Wis. 464, 468, 213 N.W. 469, 471 (1927). In the latter case, the court adopted "the logic and the law" of *Fogelsville & T.E. Co. v. Pennsylvania P. & L. Co.,* 114 A. 822, 823 (Pa. 1921), where the Pennsylvania court recognized that a public utility commission "is an arm of the state government, *created for the benefit of the people* as well as the utilities it in part controls." *Commonwealth,* 192 Wis. at 471, 213 N.W. at 472 (emphasis added).

Given its history and the purpose for which it was created, we believe that the commission's authority to regulate public utilities "for the common good," *Madi-*

*son,* 129 Wis. at 264, 108 N.W. at 68 (citation omitted), transcends the particular utility's customer lists. And where it appears that a request by one utility would, if granted, adversely affect Wisconsin customers of an adjoining utility by lessening available power, or raising costs and rates, we believe the commission has the authority to recognize and consider these effects in determining whether the requesting utility's action would promote the "public" convenience and necessity, as that phrase appears in sec. 196.49(3)(b), Stats. We agree with the commission that the interpretation advanced by WPL, which would limit the commission's powers to consideration of the costs and benefits of a utility's proposal on "an insular basis," would be incompatible with modern integrated transmission system planning and the agency's broad authority to regulate public utilities in the public interest.

In other areas of its regulatory jurisdiction, the commission routinely considers the effect of a particular utility's operations on people and resources beyond that utility's own customers and service area. In rate cases, for example, the commission has required individual utilities to design their rates in consideration of broadly stated environmental goals and the state's overall "energy economy." *See* the discussion in Cudahy & Malko, *Electric Peak-Load Pricing: Madison Gas c :d Beyond,* 1976 Wis. L. Rev. 47 (1976). We do not believe the commission's powers should be more circumscribed when it considers an application to add new facilities to an electric utility's production and distribution system. We hold, therefore, that the word "public" in the phrase "public convenience and necessity" in sec. 196.49(3)(b), Stats., is not limited to the ratepayers

of the particular utility involved, but extends to all consumers of electricity in Wisconsin.

## II. THE COMMISSION'S FINDINGS AND ORDER

WPL next argues that the commission's order must be overturned because it made no findings on any of the three grounds for rejection stated in sec. 196.49(3)(b), Stats. As indicated, after stating that a utility cannot proceed with a construction project in the absence of a certificate of public convenience and necessity, the statute goes on to say that the commission may refuse certification if the project will (a) substantially impair the efficiency of the utility's service, or (b) result in facilities unreasonably in excess of the utility's probable future requirements, or (c) will add to the cost of service without increasing the value or quantity thereof, unless the utility waives consideration of the project costs in fixing its rates.

The commission found, among other things, that construction of the phase shifter "would not significantly improve the efficiency or reliability of the [company's] electrical system, and consequently it would add to the cost of electric service for all ratepayers without proportionately increasing the value of service." WPL contends that because the finding is couched in terms of "all ratepayers," rather than "WPL ratepayers," it cannot stand as support for the final order. We have previously held that in exercising its certification functions under sec. 196.49, Stats., the commission may consider the interests of all consumers of electric power in Wisconsin. Even so, WPL argues, the unamplified phrase "all ratepayers" could conceivably include all of the ratepayers on the interconnected

MAPP-MAIN system, and that class includes consumers in other states.

■

Regardless of the choice of language, there is evidence in the record indicating that WPL's intended use of the phase shifter would reduce its losses by shifting them to "neighboring utilities in the MAIN pool," including at least three Wisconsin utilities—Wisconsin Public Service Corporation, Wisconsin Electric Power Company, and Madison Gas and Electric Company. Thus, the fact that, given the interconnections among the various in-state and out-of-state members of MAIN and MAPP, the phrase "all utilities" suggests something broader than Wisconsin ratepayers alone is of little consequence for there is evidence that Wisconsin electric consumers will be adversely affected by WPL's expected use of the phase shifter.*

WPL next points to the closing words of sec. 196.49(3)(b)3, Stats.—"unless the public utility waives consideration by the commission, in the fixation of rates, of such consequent increase of cost of service"—and argues that the commission may not deny an

---

*WPL maintains that this is not so and points to the testimony of another witness to the effect that operation of the phase shifter will not shift the power flow to other Wisconsin utilities, but only to out-of-state utilities. It is for the commission, not the courts, to resolve conflicts in the testimony, however. *Sanitary Transfer & Landfill, Inc. v. DNR*, 85 Wis. 2d 1, 14, 270 N.W.2d 144, 149–50 (1978).

In addition, it is undisputed that other Wisconsin utilities are members of one or both pools. And the fact that the term "all ratepayers" may be read to include one or more out-of-state utilities does not abrogate the commission's power to regulate on behalf of Wisconsin consumers who are affected by a particular proposal.

application on grounds that the costs of the new facility outweigh the benefits unless it first offers the utility the option of waiving consideration of those costs in its rate base. We believe the issue is moot for there is no evidence in the record that WPL would be willing to make such a waiver and, in fact, WPL's counsel conceded at oral argument that the company would not do so.

## III. ARBITRARY AND CAPRICIOUS ACTION

Finally, WPL argues that the commission acted arbitrarily when it "required" the company to obtain agreements from other utilities to compensate it for transmission losses incurred in power transfers between outlying utilities, and then denied WPL's request for rehearing partly on grounds that any efforts the company was making along those lines would not cause the commission to change its decision.

The argument is based on the following statement in one of the commission's ultimate findings of fact: "[I]t is appropriate for Wisconsin Power and Light Company to investigate the establishment of contractual agreements before investing in major electric facilities as the first step to achieve compensation from other utilities participating in power transfers where WPL is not a party to the transfer's transition." At another point in its decision, the commission noted that WPL had not "exhausted available institutional or contractual means" to obtain compensation in such transfers, and that the company "needs to explore the possibility" of such agreements.

WPL apparently interpreted these comments as the commission's "promulgat[ion]" of a "requirement" that the company attempt to secure such contracts as a

condition *to certification of the phase shifter.* In response, WPL claims that it made "overtures" to Commonwealth Edison concerning the possibility of negotiating some form of compensation, and then petitioned the commission for rehearing partly on the basis of those overtures. The commission, by letter, denied the petition, stating, among other things, that .while it considered WPL's overtures to other utilities "an appropriate step," this did not constitute "new information which ... would affect the outcome of the decision." WPL contends that the commission lacked the authority to impose such a requirement as a precondition to consideration of the application and, further, that the commission's denial of the rehearing petition after WPL did what it was told to do was arbitrary and capricious.

■ We agree with the commission that there is nothing in its order which "requires" WPL to take any such steps as a condition to consideration of its application to install the phase shifter. We see no way the language complained of can be regarded as anything but a gratuitous remark, or, as the commission describes it, something in the nature of a suggestion or "good advice." Nor do we see anything in the commission's letter denying WPL's petition for rehearing that suggests arbitrary or capricious action in any form. We affirm the order in all respects.

*By the Court.*—Order affirmed.